FILED

JUL - 1 2005

MICHAEL W. DOBBINS
CLERK, U. S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAMPUS INVESTMENTS, INC., an Ohio corporation, | ) | Case No. 05C 3877 |
| Plaintiff | ) | JUDGE DER-YEGHIAYAN |
| v. | ) | Judge: Hon. ~~Rebecca R. Pallmeyer~~ |
| VILLAGE OF LAKE VILLA, ILLINOIS, a municipal corporation, and BRETT BENNETT | ) | DEMAND FOR JURY TRIAL |
| Defendants | ) | MAGISTRATE JUDGE GERALDINE SOAT BROWN |

## VERIFIED COMPLAINT

COMES NOW Campus Investments, Inc., and for its various claims against defendants, the Village of Lake Villa and Brett Bennett, states as follows:

## JURISDICTION AND VENUE

1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332 (Diversity of Citizenship Jurisdiction). This Complaint also alleges violations of the Plaintiff's rights under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68, giving this court jurisdiction over those claims pursuant to 18 U.S.C. § 1964(c).

2. Personal jurisdiction and venue is predicated upon 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) since the defendants reside and transact their affairs in the Village of Lake Villa, which is located in Lake County, Illinois which is located within the geographical area of this court. See 28 U.S.C. § 93(a)(1) (Northern District of Illinois comprises Lake County).

## PLAINTIFF AND DEFENDANTS

3. Campus Investments, Inc., is an Ohio corporation, that is engaged in the real estate development with its place of business in Mahoning County, Ohio (the "Plaintiff").

4. The Village of Lake Villa, Illinois is a municipal corporation duly organized and existing under the Illinois Municipal Code, 65 ILCS 5/1-1-1 *et. seq.* (the "Village").

5. The Village has over a dozen employees and consultants, and defendant Brett Bennett is a part-time engineering consultant to the Village, he is a resident and citizen of Illinois and works at the Lake County Building Department in Waukegan, Illinois.

6. The chief executive officer of the Village is the mayor Frank M. Loffredo (the "Mayor"). The Village is governed by the Board of Trustees which includes the Mayor and six trustees, David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, and Darlene Hall the duly elected and acting trustees of Lake Villa (the "Trustees").

## THE PROPERTY AND SURROUNDINGS

7. Plaintiff is the owner of 10 acres of real property located at 725 Grand Ave, in Lake Villa, Lake County, Illinois. The property is legally described as the West half of the East half of the Northeast quarter of the Northeast quarter of section 4, Township 45 North, Range 10 East of the Third Principle Meridian, in Lake County, Illinois (the "Property").

8. The Property fronts on Grand Avenue, a four-lane state road. The Property is surrounded by residential homes, condominiums and apartments. Single Family Homes are contiguous to the land to the west with Lake View Hills with a density of 2.97 lots/ac, and Lake Villa Hills with a density of 2.99 lots/ac. East of the Property is Sheehan's Subdivision with a density of 3.08 lots/ac and apartments known as the Sanctuary of Lake Villa, with a density of 12.62 units/acre. South of the Property is the Courtyards at Cedar Crossing, a condominium

development with a density of 3.21 units/ac. North of the Property and directly across the street, is the Waters Edge Apartments with a density of 10.8 units/ac.

9. The Property has a small man-made pond near the front of the Property. The pond is located in the center of the Property, and since the Property has a narrow width, it is impractical to subdivide the Property without filling the pond. The small pond is a low quality isolated wetland and not regulated by the Army Corps of Engineers. The Property is also very wooded with many mature trees and any development will require tree removal and grading to make the Property economically viable.

**FIRST APPLICATION TO SUBDIVIDE THE PROPERTY**

10. On June 20, 2003, following Lake Villa's procedures for rezoning and subdividing property, the Plaintiff **submitted all necessary, plans, application fees and other documents** to rezone subdivide the Property into a 30-lot subdivision which contained a density of 3.02 lots per acre and was compatible with the surrounding densities.

11. On August 7, 2003, the Plan Commission voted to recommend denial of the request to re-zone and subdivide the land into 30-lots. On August 27, 2003, the Lake Villa Board of Trustees voted to deny the request to re-zone and subdivide the land into 30 lots.

12. The many statements made by Village officials at the hearings, and discussions after the hearing, made it clear that no development of the Property would be approved. The Village officials wanted 70% of land remain in its natural state effectively limiting the use of the 10-acre Property to only one existing habitable structure. This destroyed all economical value, and made residential development financially unfeasible.

13. On October 14, 2003, the **Plaintiff filed a lawsuit in this Court**, *Waller, et. al. v. Lake Villa*, Case No. 03CV-7224, seeking the right to develop the land and damages.

## SECOND APPLICATION TO SUBDIVIDE THE PROPERTY

14. On January 14, 2004, Lake Villa voluntarily re-zoned the entire Village, placing the Property in a zone which permitted the 30-lot subdivision.

15. On March 19, 2004, following the Lake Villa procedures for subdividing property, the Plaintiff once again submitted all necessary, plans, fees and other documents to subdivide the Property into a 30-lot subdivision. This application was identical to the first but now complied with the new zoning of the land. Illinois Municipal Code, 65 ILCS § 5/11-12-8 provides a 90-day cycle for preliminary plan approval or denial, or the plan is deemed approved. The Village had until June 17, 2004 to approve or deny the preliminary plans, but did neither, and the Lake Vista preliminary plat was statutorily approved on June 17, 2004.

16. On July 6, 2004, the Village received an application for final plat approval of the 30-lot subdivision. Illinois Municipal Code, 65 ILCS § 5/11-12-8 provides a 60-day cycle for final plan approval or denial, or the application is deemed approved. The Village had until September 5, 2004 to act upon the application, but once again did nothing, therefore, the Lake Vista final plat was statutorily deemed approved on September 5, 2004.

17. On September 8, 2004, the Village received a five-day notice letter from the Plaintiff, pursuant to Illinois Municipal Code, 65 ILCS § 5/11-12-8 which provides if the Village "fail to act upon the final plat" the applicant can give five days notice that it will file a complaint seeking an order authorizing the recorder to record the plat "without the approval of the corporate authorities." The Village did not act on the five day notice.

18. On September 17, 2004 the Plaintiff filed an amended complaint seeking deemed approval of the plat, and damages. On September 23, 2004, the Plaintiff filed a motion

for summary judgment seeking deemed approval of the plat. The motion was set for hearing on October 21, 2004.

**PARTIES ENTER INTO A SETTLEMENT AGREEMENT**

19. On October 13, 2004 the Plaintiff and the Village and its officials entered into a Settlement Agreement (attached hereto as Exhibit 1). The Settlement Agreement was approved by Ordinance and recorded in the Lake County Recorder of Deeds.

20. The Settlement Agreement attached the plans submitted on July 6 2004, as Exhibit A and defined them as the "Final Plat" and provided that the "Village agrees that the Property may be subdivided into a 30-lot subdivision in accordance with the Final Plat."

21. Pursuant to the Settlement Agreement the Plaintiff had to comply with Paragraph 1 (make 21 engineering changes to the plans) and Paragraph 2 (obtain waiver to fill the pond by the County) before could commence construction. The Plaintiff also agreed to pay various fees and post a letter of credit in Paragraphs 3-7 before starting construction.

22. Paragraph 1 of the Settlement Agreement provided that the Plaintiff would "correct the Final Plat to conform to the comments from the Village Engineer attached hereto as Exhibit B" and once the changes set in Exhibit B were made "the Plat Officer, the Mayor and Village Clerk shall sign the Final Plat for recording." The oral and written statements from the Village's attorney, Charles Hervas, confirmed that Exhibit B was a "comprehensive list of engineering comments" and that the Village promised that they "would be willing to work towards the speedy approval of the subdivision plat."

23. Paragraph 2 of the Settlement Agreement provided that "the subdivision of the Property shall require, unless exempt, the approval from the Lake County Stormwater

Management Commission relating to the proposed filling of a pond located on the Property." On October 26, 2004, the Lake County Stormwater Management Commission granted an exemption allowing the Plaintiff to fill the pond (Exhibit 2).

## PLAINTIFF MAKES AGREED ENGINEERING CHANGES

24. The many letters and discussions between the Village's Attorney, Charles Hervas, and specific wording of the Settlement Agreement confirm that the plans submitted by the Plaintiff on July 6, 2004 were approved as submitted, subject to the Plaintiff revising the plans to conform to twenty-one very specific changes identified in Exhibit B, and that no public hearings or additional permits of any kind were necessary to start construction, other than the payment of fees and posting of the letter of credit.

25. The Plaintiff submitted revised engineering plans to the Village incorporating the twenty one engineering changes agreed upon in the Settlement in Exhibit B.

26. On March 16, and March 30, 2005, former Village Attorney John Mullen stated at a public meeting that the Plaintiff's plans were approved by settlement and there was no opportunity for further review.

27. On April 21, 2005, Keith Corso, the Village's Engineer, confirmed in writing that the Plaintiff's subdivision plans dated April 18, 2005 complied with the engineering comments set out in Exhibit B and stated that "we are prepared to sign the plat." (Exhibit 3).

## VILLAGE BREACHES THE TERMS OF THE SETTLEMENT BY DEMANDING ENGINEERING CHANGES BEYOND THOSE PROVIDED IN THE SETTLEMENT

28. On April 22, 2005, the day after the Village Engineer Keith Corso stated in writing that all plan changes requested in Exhibit B were satisfied, defendant Brett Bennett, the Village's stormwater engineering consultant, sent a letter to the Plaintiff demanding thirty-four additional engineering changes to the plans. The comments were unending and stated that he "will conduct a more through review after everything has been adjusted."

29. On April 27, 2005, former Village Attorney John Mullen stated at a public meeting that the Plaintiff's plans were approved by settlement and there was no opportunity for further review.

30. The Plaintiff did nothing with regards to the changes demanded by Brett Bennett, after all, they complied with the engineering changes in Exhibit B and obtained a waiver of the filling of the pond by the County; Consequently, they were prepared to commence construction.

31. On May 15, 2005 the former Village attorney, John Mullen, retired and moved out of state. The Village hired James Bateman as its new Village Attorney. The Village's new attorney, contacted the Plaintiff's attorney, and was informed that the plans were approved by settlement and the conditions of the settlement had been complied with, and that the Village's consulting engineer, Brett Bennett demanded thirty-four additional engineering changes to the plans, and that these demands were a breach of their Settlement Agreement.

32. On May 26, 2005, the Village Attorney, James Bateman, investigated the demands by Brett Bennett and stated in an email to the Plaintiff's attorney that the "Watershed Development Permit Brett [Bennett] issues is essential." The Village Attorney asked the Plaintiff to meet at the Village on June 2, 2005 to discuss the changes.

33. The Plaintiff objected to additional reviews, and further engineering changes well beyond the Village's promise in the Settlement Agreement. The Plaintiff also noted that the

of the thirty-four demands in Brett Bennett's letter, none of the comments were listed as agreed upon changes in Exhibit B of the Settlement Agreement, and only one comment cited any provision of the Village's code for its authority. The Plaintiff agreed to meet but asked that Brett Bennett either redline the plans with his comments or provide citations showing where the authority for the same is found in the Village's regulations.

34. On May 27, 2005, Village Attorney, Jim Bateman, telephone the Plaintiff's Attorney, and informed him that he received an email from Brett Bennett agreeing to provide citations confirming the authority for his requested engineering changes. However, on the date of the meeting on June 2, 2005, no citations or redlines were provided by Brett Bennett. This lack of cooperation, and hide and seek method of review, is a breach of the Village's promise "to cooperate fully" and to execute "all supplementary documents and to take all additional actions" which are "necessary or appropriate to give full force and effect to the basic terms and intent of this Settlement Agreement."

35. On June 2, 2005, the Plaintiff and its engineer and attorney, met with the Village's consulting engineer Bennett Bennett, the Building Commissioner Robert Streicher, and Village Attorney James Bateman. The hostility toward the Plaintiff and its development project was apparent in Brett Bennett's tone and conduct. It was also apparent that Brett Bennett's demands were a breach of the Settlement Agreement. He wanted the Plaintiff to "take-out a couple of lots" and to make the detention pond larger, or he would not sign-off on the plans, and would not sign-off on the eventual sewer construction during its inspection.

36. On June 3, 2004, the day after the face-to-face meeting, Brett Bennett continued his obstruction of the Plaintiff's development, by telephoning Rick Zirk of Grand Pointe

Homes, the buyer of the Plaintiff's lots, and informing him that there were problems with the subdivision, and that the problems were not resolved at the meeting the day before. Brett Bennett told Rick Zirk that he would not approve the subdivision unless a couple of lots were removed and the pond enlarged. Brett Bennett also stated that he would be the inspector of development and that he will not approve anything related to the project. He also stated if any plans were given to him for review that he would take his time in reviewing the plans.

37. On June 3, 2004, shortly after receiving the telephone call from Brett Bennett, Rick Zirk telephoned the Village and talked to Building Commissioner Robert Streicher and Streicher stated he was at the meeting the day before and that the subdivision had problems and that this required a larger detention pond and the removal of a couple of lots.

38. This was an apparent breach of the Settlement Agreement since Robert Streicher signed the agreement as a defendant and agreed and promised "that the Property may be subdivided into a 30-lot subdivision in accordance with the Final Plat." Apparently, now 30 lots actually meant twenty eight lots, and the agreement for twenty one specific changes to the plans actually meant fifty-five unending review comments. Moreover, the promise for speedy approval, actually meant an unending review process.

39. On June 6, 2004, the Plaintiff informed the Village Attorney of the telephone call from Brett Bennett to Rick Zirk, which now entered into tortious interference, and that his hostility and lack of cooperation was a breach of the settlement agreement, and that his threats of **retaliatory inspections**, require that he be removed from any further review and inspection of the development.

40. On June 20, 2005 the Plaintiff submitted a letter to the Mayor stating that "Brett Bennett has a personal vendetta against the project" and that the Plaintiff "would prefer that he

remove himself from any further review or inspection of our project." The letter also stated that the mylar would arrive at the village for signature on June 22, 2005, along with the required fees and letter of credit, and that it planned on starting construction on Monday, June 27, 2005.

41. On June 22, 2005 the Village Attorney, James Bateman stated in an email to the Plaintiff's attorney "I am not able to comment on your desire to start construction next Monday, other than to say that that would obviously be dependent on the securing of all required permits, including those required by other applicable Village ordinances." Clearly, the Village Attorney wanted the Plaintiff to comply with additional permits and plan reviews which were clearly outside the scope of the Settlement Agreement.

**VILLAGE INTENTIONALLY BREACHED THE SETTLEMENT**

42. Brett Bennett's demand that the Plaintiff remove a couple of lots to increase the retention pond size is a breach of the written promise by the Village, the Mayor and Trustees, that the "Property may be subdivided into a 30-lot subdivision in accordance with the Final Plat." Thirty lots is not the same as twenty-eight. Also, the plans attached to the Settlement Agreement in Exhibit A show unmistakably the specific size of the detention pond, and the plans before the Village are exactly as shown on Exhibit A of the Settlement.

43. The Settlement Agreement provides for certain engineering modifications identified in Exhibit B of the settlement. The agreement also provides that once those are completed "the Plat Officer, the Mayor and Village Clerk shall sign the Final Plat for

recording." The Plaintiff complied with the engineering comments set out in Exhibit B and the plat should now be recorded without further demands from Brett Bennett.

44. When the Plaintiff and Village entered into the Settlement Agreement the Plaintiff had already submitted a sketch plan (7-19-03), grading plans (1-19-04), preliminary plans (3-19-04), and final construction improvement plans (7-06-04) to the Village, its attorneys and engineers, many months before the final Settlement Agreement was signed on October 13, 2004. Those plans were reviewed by Village officials, and that is how the detailed language of Exhibit B was included in the Settlement Agreement, *i.e.*, from Village Engineer's comments. Exhibit B is a comprehensive list of the Village's comments. There was no exemption in the Settlement for a review from Brett Bennett whose sole authority comes from the Village. The only exemption is exemption from the County with regards to filling the pond, and the Plaintiff obtained that waiver on October 26, 2004.

45. Former Village Attorney, John Mullen stated at three Trustees meetings (March 16, 2005, March 30, 2005 and April 27, 2005) that the development was approved and there was no opportunity for further review.

46. During the Settlement negotiations, the Village's attorney Charles Hervas stated that the Plaintiff did not have to attend any public meetings. They would bypass that process via resolution of the litigation. If the settlement can, and did, bypass the public meetings and review and approvals by the Planning Commission, and the public meeting and public review and approval by the Village Board, then it clearly can and did bypass any necessity for review and approval from Brett Bennett. Moreover, if Brett Bennett wanted to incorporate his

comments into the plans, then he could have done so before the Settlement Agreement was signed by all parties, and not nine months afterwards.

47. Two issues were central to the Settlement Agreement: first that the plans were completed once Exhibit B was satisfied, and second that any approvals from the Village would take only a few weeks. As to the first, the Settlement Agreement provides that the "Village agrees that the Property may be subdivided into a 30-lot subdivision in accordance with the Final Plat." Brett Bennett's demand that the Plaintiff lose a couple of lots is a direct violation of this promise. If the Village, or Brett Bennett, had demanded a lot reduction before the Settlement was signed, the Plaintiff would not have settled.

48. On April 21, 2005 Village Engineer Keith Corso confirmed that the Plaintiff has complied with the engineering comments set out in Exhibit B. The Village now demands that the Plaintiff engage in hide and seek review with Brett Bennett. This is a violation of the Settlement, and the promise that they "would be willing to work towards the speedy approval of the subdivision plat." The Settlement Agreement was signed nine months ago on October 13, 2005. The nine month delay is not within the letter or spirit of a "speedy approval."

49. Brett Bennett demanded in his April 22, 2005 letter and at the June 2, 2005 meeting that the release rate calculation needs to exclude the offsite runoff and use "strictly on-site tributary area only." The effect of removing the off-site tributary increased the elevation of the water in the pond because less water was retained. However, Lake Villa's Site Dev. Ordinance § 8.2.5.O.4 provides that the release rate shall include "the total tributary area (on-site and off-site)." The County's Technical Reference Manual similarly provides for the

inclusion of "off-site" runoff, and all examples in the Manual include the off-site tributary discharge in the calculations. Brett Bennett's refusal to cite to regulations, was more than laziness; he sought to hide behind the demands beyond the existing regulations.

50. On June 6, 2004, the Plaintiff informed the Village Attorney of the telephone call from Brett Bennett to Rick Zirk, which now entered into tortious interference, and that his hostility and lack of cooperation was a breach of the settlement agreement, and that his threats of **retaliatory inspections**, require that he be removed from any further review and inspection of the development.

**COUNT 1**
**SPECIFIC PERFORMANCE**

COMES NOW Campus Investments, Inc., and files its complaint for Specific Performance against the defendant, the Village of Lake Villa and states as follows:

51. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

52. The Plaintiff has fully performed its obligations under the Settlement Agreement and all relevant conditions precedent, and the Plaintiff has always been, and is as of the date of this Complaint, ready, willing and able to comply with the terms of the Settlement Agreement.

53. Plaintiff has no adequate remedy at law for Lake Villa to cease its violation of the Settlement Agreement.

WHEREFORE, the Plaintiff, Campus Investments, Inc., demands judgment against defendant the Village of Lake Villa for the following:

(A). The court order defendant the Village of Lake Villa to specifically perform its obligations under the Settlement Agreement by signing on the final plat dated April 18, 2005 (upon the payment of fees and letter of credit), and by ordering the subdivision plans dated April 18, 2005 as being in full compliance with the terms of the Settlement Agreement, and by ordering the Village of Lake Villa to permit the Plaintiff to commence construction immediately in accordance with the subdivision plans dated April 18, 2005;

(B). Costs of suit including reasonable attorneys fees; and

(C). Such other and further relief this Court may deem just and proper

**COUNT 2**
**DECLARATORY RELIEF**

COMES NOW Campus Investments, Inc., and files its complaint for Specific Performance against the defendant, the Village of Lake Villa and states as follows:

54. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

55. An actual controversy has arisen and now exists between the Plaintiff and Defendant regarding their respective rights and duties in that the Plaintiff contends that its subdivision plans dated April 18, 2005 complied with the terms of the Settlement Agreement and the Defendant contends that additional engineering changes are required, including the reduction of lots, for the enlargement of the retention pond.

56. The Plaintiff desires a judicial determination of its rights and duties under the Settlement Agreement, and a declaration that its subdivision plans dated April 18, 2005 complied with the terms of the Settlement Agreement.

57. A judicial declaration is necessary and appropriate at this time under all the circumstances so that the Plaintiff may determine its rights and duties under the Settlement Agreement.

58. The Plaintiff has no available administrative remedies by which to challenge the refusal by the Village and its consultants from continuing to demand changes to the subdivision plans beyond the scope of the Settlement Agreement.

WHEREFORE, the Plaintiff Campus Investments, Inc., demands judgment against defendant the Village of Lake Villa for the following:

(A). A declaration of the court that the Plaintiff's subdivision plans dated April 18, 2005 complied with the terms of the Settlement Agreement, and that the Village of Lake Villa had no authority to demand additional engineering reviews and changes after April 21, 2005, and that all engineering changes sought after that date are null and void;

(B). Costs of suit including reasonable attorneys fees; and

(C). Such other and further relief this Court may deem just and proper.

**COUNT 3**
**INJUNCTIVE RELIEF**

COMES NOW Campus Investments, Inc., and files its complaint for Specific Performance against the defendant, the Village of Lake Villa and states as follows:

59. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

60. Unless the Village's wrongful conduct is restrained and enjoined, the Plaintiff will suffer great and irreparable harm, in that it will be forced to file bankruptcy.

61. The Plaintiff has no adequate remedy at law for the injuries which the Plaintiff has suffered and will continue to suffer in the future unless the Defendant's wrongful conduct is restrained and enjoined, because it is and will be impossible for the Plaintiff to determine the precise amount of damage, and that even if those damages are ascertained it may be too late to save the Plaintiff from imminent demise in bankruptcy.

WHEREFORE, the Plaintiff Campus Investments, Inc., demands judgment against defendant the Village of Lake Villa for the following:

(A). Issuance of a temporary restraining order, preliminary injunction, and permanent injunction, enjoining the Village of Lake Villa , and anyone acting on its behalf, from refusing to permit the Plaintiffs to construct the subdivision in accordance with its plans dated April 18, 2005, and further restraining and enjoining the Village of Lake Villa , and anyone acting on its behalf, from engaging in retaliatory inspection of the construction of the subdivision.

(B). Costs of suit including reasonable attorneys fees; and

(C). Such other and further relief this Court may deem just and proper.

**COUNT 4**
**BREACH OF CONTRACT**

COMES NOW Campus Investments, Inc., and files its complaint for Breach of Contract against the defendant, Brett Bennett and states as follows:

62. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

63. The Settlement Agreement is definite and certain and contains the Village and its consultants promises. Brett Bennett was made aware of the Settlement Agreement and the specific terms of the same, but he has nonetheless refused to comply with its terms.

64. Plaintiff has performed all conditions precedent contained in the Settlement Agreement and stands ready, willing and able to fulfill his obligations under the Settlement.

65. Although the Brett Bennett is bound by the Settlement Agreement and despite the Plaintiff's willingness and ability to perform its obligations under the Settlement Agreement, Brett Bennett does not intend to honor his obligations under the Settlement.

66. As a proximate result of Brett Bennett's conduct the Plaintiff has been damaged in an amount to be proven at trial, which amount exceeds Five Hundred Thousand Dollars ($500,000.00).

WHEREFORE, the Plaintiff Campus Investments, Inc., demands judgment against defendant the Brett Bennett for the following:

(A). Damages in an amount to be proven at trial, which amount exceeds Five Hundred Thousand Dollars ($500,000.00).

(B). Costs of suit including reasonable attorneys fees; and

(C). Such other and further relief this Court may deem just and proper.

## COUNT 5
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)

COMES NOW the Plaintiff Campus Investments, Inc., and for its complaint for violation of 18 U.S.C. § 1962(c) against Defendant Brett Bennett (Lake Villa is not a defendant in this cause of action, and damages are not sought from Lake Villa under this cause of action) state as follows:

67. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

68. The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, provides a private civil action to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

69. 18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

70. The definitional section of RICO defines a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). Racketeering activity is defined in 18 U.S.C. § 1961(1)(A)-(B) to include extortion in violation of 18 U.S.C. § 1951, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and any act involving extortion chargeable under state law.

## THE RACKETEERING DEFENDANT

71. 18 U.S.C. § 1962(c) makes it unlawful for "any person" to conduct or participate, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity. The definitional section of RICO defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

72. Lake Villa is not a defendant in this cause of action, and damages are not sought from Lake Villa under this cause of action.

73. Defendant Brett Bennett has been responsible for overseeing the Village's storm-water activities for Village developments for five years. The racketeering activity has been ongoing for five years.

74. Each and every act of Brett Bennett was done for personal gain, self interest and for personal benefit. Brett Bennett benefitted individually, either directly or indirectly, from the pattern of racketeering activity, namely, extortion under the color of official right over a period of more than five years.

75. Each and every act of Brett Bennett was motivated by evil intent, or reckless or callous indifference to the rights of the Plaintiff. The acts of Brett Bennett were in some manner proximately responsible for the events and happenings alleged in this Complaint and for the Plaintiff's injuries and damages.

76. Defendant Brett Bennett conducted and participated, directly and indirectly, in the affairs of Lake Villa through the pattern of racketeering activity, namely, extortion of developers under color of official right, over a period of more than five years and is thereby considered a person (infiltrating racketeer) within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

## VILLAGE OF LAKE VILLA IS A RICO ENTERPRISE

77. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. The definitional section of RICO defines "enterprise" as "any individual, partnership, corporation, or other legal entity." 18 U.S.C. 1961(4).

78. Lake Villa is engaged in many large commercial ventures, and purchases on a regular basis a substantial quantity of local equipment and supplies that are manufactured out-of-state. The Village also makes direct out-of-state purchases of supplies, materials, equipment and vehicles. Lake Villa is involved in many laudable governmental functions. However, it is also the vehicle through which the pattern of racketeering activity (extortion of developers) is committed. Lake Villa is also the direct or indirect beneficiary (unlawful land, improvements or engineering) of the racketeering activity.

79. Lake Villa is an enterprise affecting interstate commerce within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68.

**BRETT BENNETT COMMITTED MULTIPLE RACKETEERING ACTS OF EXTORTION UNDER COLOR OF OFFICIAL RIGHT**

80. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. The definitional section of RICO provides that extortion in violation of federal law, 18 U.S.C. § 1951, is "racketeering activity" and considered a RICO violation. 18 U.S.C. § 1961(1)(B).

81. The federal crime of extortion is broadly defined by 18 U.S.C. § 1951(b)(2) to mean "the **obtaining of property from another, with his consent**, induced by wrongful use of actual or threatened force, violence, or fear, or **under color of official right**."

82. Under 18 U.S.C. § 1951(b)(2), extortion may be committed either by wrongful use of fear of economic harm, or under color of official right. Defendant Brett Bennett committed extortion under both color of official right and by wrongful use of fear of economic harm.

83. Extortion under color of official right is a RICO offence which can only be committed by municipal officials in the context of the work of a municipal agency. Extortion under color of official right is when a public official, **obtains (or attempts or conspires to obtain) property not due his office from another person with his consent**. The use of force, threats or fear is not required for extortion under color of official right, it is implied from the public official's position of authority over the victim.

84. Brett Bennett has long ago realized that delay is his secret weapon which allows him to achieve the extortion as a guise of land use planning. Brett Bennett has used many unlawful practices to ensure unreasonable expense and delay. He inflicts maximum expense on the Plaintiff by using a shell game of never-ending conditions to force endless plan review changes as a ruse that the conditions are unsatisfied, all in violation of the Settlement Agreement.

85. Brett Bennett is aware that concurrent with any delay is the payment of taxes on the land, interest on loans, salaries and other costs (legal, engineering, etc). The Plaintiff does not have the financial resources to keep their land vacant and unproductive while they litigate to force Brett Bennett to comply with the Settlement Agreement.

86. Brett Bennett long ago realized that there is no constitutional validity to his demands, however, he also realizes that every developer will fear the threat of economic harm and possible bankruptcy that come from the delay in forcing compliance. This forces developers to **agree to unconstitutional exactions** simply to **avoid economic devastation and possible bankruptcy**.

87. Brett Bennett uses fear of economic loss to obtain the reduction of lots to which he had no lawful claim. This has been engaged in by Brett Bennett for so long it is regarded as routine. Brett Bennett's threats of economic loss by delaying the approval of the plans were veiled threats made by suggestion, implication and inference. Brett Bennett's exploitation of fear of economic harm worked on the Plaintiff's anxiety, concern or worry about economic harm.

88. Brett Bennett long ago realized that stalling is the functional equivalent of winning on the merits, and he uses stalling as a weapon to gain the reduction of lots. Brett Bennett has made delay a well-honed tactical weapon and he is fully aware that the Plaintiff, or other developers, will fear the threat of economic harm that comes from the delay and agree to the unlawful exaction, i.e. reduction of lots and enlargement of the detention pond. Brett Bennett has used the threat of delay for so long (since 2000) that it is widely regarded as routine.

89. The Plaintiff reasonably believed that Brett Bennett had the power to harm it economically and that he would exploit that power and harm the Plaintiff. The Plaintiff realized that any vindication of its rights meant that it would have to keep the land vacant and unproductive. This delay put it in fear of economic harm and possible bankruptcy. Considering

all the circumstances, a reasonable corporation situated as the Plaintiff was situated would also have perceived a real fear of economic harm and possible bankruptcy if they did not go along with Brett Bennett's unlawful demands.

90. Defendant Brett Bennett demanded that the Plaintiff lose two lots, which are already approved, or he would obstruct the development and even engage in retaliatory inspections.

91. Between January 9, 2004 and June 30, 2005 (date of this complaint) Brett Bennett committed acts of racketeering when he obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain two lots from the Plaintiff and by forcing it to enlarge its detention pond, with Plaintiff's consent, under color of official right, in violation of 18 U.S.C. § 1951.

92. Between January 9, 2004 and June 30, 2005 (date of this complaint), Brett Bennett committed acts of racketeering when he obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain, with the Plaintiff's consent, two lots from the Plaintiff and by forcing it to enlarge its detention pond, using fear of economic loss, in violation of 18 U.S.C. § 1951.

93. Between January 9, 2004 and June 30, 2005 (date of this complaint) Brett Bennett committed acts of racketeering when he demanded that the Plaintiff make engineering changes to the plans that were not required by the Settlement Agreement, with Plaintiff's consent, under color of official right, in violation of 18 U.S.C. § 1951.

94. Between January 9, 2004 and June 30, 2005 (date of this complaint), Brett Bennett committed acts of racketeering when he obstructed, delayed, and affected commerce

by extortion, that is, by demanding that the Plaintiff make engineering changes to the plans that were not required by the Settlement Agreement, using fear of economic loss, in violation of 18 U.S.C. § 1951.

95. Between January 9, 2004 and June 30, 2005 (date of this complaint) Brett Bennett committed acts of racketeering when he demanded larger sewer pipe, and additional inlets to the plans all of which were not required by the Settlement Agreement, with Plaintiff's consent, under color of official right, in violation of 18 U.S.C. § 1951.

96. Between January 9, 2004 and June 30, 2005 (date of this complaint), Brett Bennett committed acts of racketeering when he obstructed, delayed, and affected commerce by extortion, that is, by demanding larger sewer pipe, and additional inlets to the plans all of which were not required by the Settlement Agreement, using fear of economic loss, in violation of 18 U.S.C. § 1951.

**BRETT BENNETT COMMITTED MULTIPLE RACKETEERING ACTS OF MAIL AND WIRE FRAUD**

97. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. The definitional section of the RICO 18 U.S.C. § 1961(1)(B) provides that mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343, is "racketeering activity" and considered a RICO violation.

98. The mail fraud statute, 18 U.S.C. § 1341, prohibits a broad range of activity by anyone who "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" and "for the purpose of executing such scheme or artifice or attempting so to do,

places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service."

99. The wire fraud statute, 18 U.S.C. § 1344, also prohibits a broad range of activity by anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire" in interstate commerce "any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme."

100. Defendant Brett Bennett used the mail to communicate with the Plaintiff over a substantial period of time. The following **letters** were sent by Brett Bennett interstate from his Illinois offices to the Plaintiff in its Ohio office using the United States Postal Service: Letter dated January 9, 2004 from Brett Bennett sent to the Plaintiff in Ohio; Letter dated March 7, 2005 from Brett Bennett sent to the Plaintiff in Ohio; Letter dated April 22, 2005 from Brett Bennett sent to the Plaintiff in Ohio.

101. The letters unlawfully demanded additional engineering, additional construction, and the loss of lots in violation of the Settlement Agreement. Each of the **interstate letters** sent by Brett Bennett used the United State mails in furtherance of their scheme to obtain (or attempt or conspire to obtain) land, improvements or engineering unlawfully from the Plaintiffs, in violation of 18 U.S.C. § 1341 (Mail Fraud).

102. The following **telephone facsimiles** were sent by Brett Bennett interstate from their Illinois office: January 9, 2004 fax of a letter of the same date from Brett Bennett in Illinois to Plaintiff in Ohio; March 7, 2005 fax of a letter of the same date from Brett Bennett

in Illinois to Plaintiff in Ohio; April 22, 2005 fax of a letter of the same date from Brett Bennett in Illinois to Plaintiff in Ohio.

103. The following **telephone calls** were sent by Brett Bennett interstate from his Illinois office: April 1, 2005 telephone call from Brett Bennett in Illinois to Plaintiff's attorney in Ohio. April 3, 2005 telephone call from Brett Bennett in Illinois to Rick Zirk in Wisconsin.

104. The following **emails** were received by Brett Bennett interstate from his Illinois office: December 8, 2003 email of letter to the Village; March 18, 2004 email of letter to the Village; July 1, 2004 email of letter to the Village; October 13, 2004 email of letter to the Village; April 18, 2005 email of letter to the Village; May 26, 2005 email of letter to the Village; June 6, 2005 email of letter to the Village; June 8, 2005 email of letter to the Village; June 22, 2005 email of letter to the Village.

105. Each of the **interstate facsimiles, telephone calls and emails** sent or received by Brett Bennett using interstate electronic communication in furtherance of their scheme to obtain (or attempt or conspire to obtain) land, improvements or engineering unlawfully from the Plaintiffs, in violation of 18 U.S.C. § 1343 (Wire Fraud).

106. Brett Bennett committed many separate acts of mail and wire fraud in furtherance of the extortion scheme in violation of 18 U.S.C. §§ 1341, 1343. The mail or wire communication related to the extortion scheme, and was incident to an essential part of the scheme, and involved many misrepresentations reasonably calculated to deceive a person of ordinary prudence. Each time a letter was sent it deprived, or attempted to deprive, the Plaintiff

of property, and resulted in a distinct injury to the Plaintiff and a concommitant benefit to Brett Bennett.

## BRETT BENNETT'S PATTERN OF RACKETEERING ACTIVITY

107. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a "pattern of racketeering activity" which is defined as "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). Extortion in violation of 18 U.S.C. § 1951 extortion in violation of 18 U.S.C. § 1951, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and any act involving extortion chargeable under state law. 18 U.S.C. § 1961(1)(A)-(B) is considered "racketeering activity."

108. Between January 9, 2004 and June 30, 2005, Brett Bennett committed multiple acts of extortion against the Plaintiff in violation of 18 U.S.C. § 1951, and multiple acts of mail and wire fraud against the Plaintiff in violation of 18 U.S.C. §§ 1941, 1943. Each act of extortion, mail fraud and wire fraud constitutes separate instances of **interrelated racketeering activity**. Brett Bennett's racketeering activity threatens to continue unabated, driven by the possibility of repeated economic gain, and the ability to invest the racketeering income back into the enterprise (the Village). The acts of extortion, mail fraud and wire fraud escalated, confirming that Brett Bennett has no intention of stopping the racketeering activity which by its very nature is projected into the future with a threat of repetition.

109. Besides the multiple extortionate acts against the Plaintiff, there are hundreds of episodes of extortion against other developers and landowners by Brett Bennett as this is the regular way of conducting the Village's affairs. The extortion activities are widespread and span a period of five years. The pattern of racketeering activities, affected not merely the

Plaintiff, but many other developers and landowners, and the Village's citizens as a whole. The very scope and persistence of the racketeering poses a special threat to social well-being of every resident of Lake Villa which are indirect victims of the racketeering activity (the extortion has raised the cost of housing in the Village). Brett Bennett's policy of demanding unlawful exactions is a pattern of racketeering activity, and unless restrained by this court, the practice is likely to continue unabated for years.

**THE PLAINTIFF'S RACKETEERING INJURY**

110. The injury to the Plaintiff's business or property was proximately caused by Brett Bennett's pattern of racketeering activity. Each act of extortion injured the Plaintiff's business or property and represents a discrete attempt to extort from the Plaintiff and had little to do with the previous or subsequent act of extortion.

111. The Plaintiff was entitled to approval of the 30-lot Lake Vista subdivision, and no independent intervening factor affected its ability to sell the lots and develop the land, except the unlawful actions of Brett Bennett. The Plaintiff had contracts to sell the Property and the Plaintiff lost development business, and Brett Bennett was the proximate cause of the lost profits from unconsummated sales opportunities, and the lost business of Five Hundred Thousand Dollars ($500,000.00) all of which was clearly forseeable.

112. As a direct and proximate cause of Brett Bennett's actions of extortion and their violations of 18 U.S.C. § 1962(c) the Plaintiff has been and continues to be injured in its business or property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, which amount exceeds Five Hundred Thousand Dollars ($500,000.00) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

WHEREFORE, the Plaintiff Campus Investments, Inc., demands judgment against defendant Brett Bennett for the following:

(A). Damages in an amount to be determined upon trial of this action, which amount exceeds Five Hundred Thousand Dollars ($500,000.00) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c);

(B). Costs of suit including reasonable attorneys fees in accordance with 18 U.S.C. § 1964(c);

(C). Such other and further relief this Court may deem just and proper.

## COUNT 6
## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)

COMES NOW the Plaintiff Campus Investments, Inc., and for its complaint for violation of 18 U.S.C. § 1962(d) against Defendant Brett Bennett (Lake Villa is not a defendant in Count 2), state the following:

113. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

114. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d) makes it "unlawful to conspire to violate [18 U.S.C. § 1962(c)]." Hence, 18 U.S.C. § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

115. Brett Bennett conspired and agreed with others to engage in the conduct or attempt conducted stated above, and also conspired and agreed to aid each other in the commission of the acts of extortion, or of an attempt to commit extortion, as stated above.

116. Brett Bennett conspired, planned and schemed to use the Village as a racketeering enterprise to extort real property, engineering and improvements through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

117. Brett Bennett agreed to conduct or participate in the affairs of Lake Villa and agreed to commit acts of extortion, as their regular way of conducting the Village's affairs, by demanding unlawful exactions (land, engineering and improvements) as a condition of development approval, under color of official right.

118. Brett Bennett conspired to violate 18 U.S.C. § 1962(c) by conducting the affairs of Lake Villa through a pattern of racketeering activity, by committing multiple acts of extortion and retaliation on the Plaintiff.

119. Brett Bennett combined, conspired and confederated with others to commit a pattern of racketeering activity, and thereby violated 18 U.S.C. § 1962(d) by conspiracy to violate 18 U.S.C. § 1962(c).

WHEREFORE, the Plaintiff Campus Investments, Inc., demands judgment against defendant Brett Bennett for the following:

(A). Damages in an amount to be determined upon trial of this action, which amount exceeds Five Hundred Thousand Dollars ($500,000.00) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c);

(B). Costs of suit including reasonable attorneys fees in accordance with 18 U.S.C. § 1964(c);

(C). Such other and further relief this Court may deem just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Sebastian Rucci (ND IL No. 90785689)
3058 Chardonnay Lane
Poland, Ohio 44514
Phone: (330) 707-1182
Fax: (330) 707-1882
Email: SRucci@msn.com
Attorney for the Plaintiff

**VERIFICATION**

I am the president of Campus Investments, Inc., the Plaintiff in this action. I have read the above Verified Complaint and know its contents, and the matters stated in Verified Complaint are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I Greg Waller, under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Dated July 1, 2005.

Campus Investments, Inc.

Greg Waller, president

EXHIBIT 1

RECEIVED
OCT 15 2004
Hervas, Solon, Condon & Bersani, P.C.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GREG WALLER, and LORRAINE ZIMMERMANN, and CAMPUS INVESTMENTS, INC., an Ohio corporation, | ) | |
| | ) | Case No. 03CV-7224 |
| Plaintiffs | ) | |
| v. | ) | |
| | ) | Judge: Hon. Rebecca R. Pallmeyer |
| VILLAGE OF LAKE VILLA, ILLINOIS, a municipal corporation, and FRANK M. LOFFREDO and DAVID DYKSTRA, and BILL EFFINGER, and JOYCE FRAYER, and DAVID HARTWIG, and JAMES MCDONALD and ROBERT RAUKOHL, and and ROBERT STREICHER and JOHN MULLEN | ) | |
| Defendants | ) | |

**SETTLEMENT AGREEMENT**

This Agreement made this day of 13th, October 2004, at Lake Villa, Illinois, by and between GREG WALLER, LORRAINE ZIMMERMAN, and CAMPUS INVESTMENTS, INC., an Ohio corporation (hereinafter referred to collectively as the "Plaintiffs"), and the VILLAGE OF LAKE VILLA (hereinafter referred to as the "Village"), FRANK M. LOFFREDO, DAVID DYKSTRA, BILL EFFINGER, JOYCE FRAYER, DAVID HARTWIG, JAMES MCDONALD, ROBERT RAUKOHL, ROBERT STREICHER and JOHN MULLEN (hereinafter collectively referred to as the "Defendants").

WITNESSETH

WHEREAS, there is now pending in the United States District Court for the Northern District of Illinois, Eastern Division, a lawsuit captioned *Waller et. al. v Village of Lake Villa, Illinois et. al.*, Case No. 03 CV 7224 (hereinafter referred to as the "Litigation"); and

WHEREAS, the subject of the Litigation is certain real property consisting of approximately ten (10) acres, said property being commonly known as 725 Grand Avenue, Lake Villa, Lake County, Illinois, and legally described as the West Half of the East Half of the Northeast Quarter of the Northeast Quarter of Section 4, Township 45 North, Range 10 East of the Third Principle Meridian, in Lake County, Illinois (hereinafter referred to as the "Property"); and

WHEREAS, Plaintiff Zimmerman warrants and represents that she is the title owner of the Property and Plaintiffs Waller and Campus Investments, warrant and represent that they are the equitable owners, with the right of possession and use, of the Property; and

WHEREAS, the Property is situated within the corporate boundaries of the Village and any subdivision and development of the Property is subject to the ordinances, codes, rules and regulations of the Village; and

WHEREAS, the Plaintiffs desire to subdivide the Property into a 30 lot subdivision as shown on the Final Plat titled Lake Vista subdivision, attached hereto as Exhibit A (hereinafter referred to as the "Final Plat"); and

WHEREAS, the parties hereto are desirous of resolving their disputes regarding the subdivision and development of the Property, and have therefore agreed between themselves to compromise and settle the Litigation and any and all claims which they may have against each other, except for the obligations that arise out of this Agreement or as expressly set forth herein; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Plaintiffs and the Defendants agrees as follows:

1. The Village agrees that the Property may be subdivided into a 30-lot subdivision in accordance with the Final Plat. The Plaintiffs agree to correct the Final Plat to conform to the comments from the Village Engineer attached hereto as Exhibit B, including any additional corrections from the Village Engineer which do not materially change the subdivision, but are necessary for the recording of the Final Plat. Once these changes are made, the Plat Officer, the Mayor and Village Clerk shall sign the Final Plat for recording.

2. The parties understand and hereby acknowledge that the subdivision of the Property shall require, unless exempt, the approval from the Lake County Stormwater Management Commission (hereinafter "SMC") relating to the proposed filling of a pond located on the Property. The Defendants agree to recommend approval of the Final Plan to SMC and to take no actions to dissuade the SMC from granting their approval. The Village shall issue a letter to the Lake County Stormwater Management Commission expressing exemption and approval of the proposed development. (See Exhibit C).

3. Prior to execution of the Final Plat by Village the Plaintiffs shall pay the Village's expenses for professional consultation by engineers, land planners, attorneys retained by the Village (other than legal fees incurred as a result of the Litigation) to review the subdivision of the Property as provided in Village Code §§ 1-8-1, *et. seq*.

4. Prior to execution of the Final Plat by Village the Plaintiffs shall pay the Village engineering inspection fees as provided in Lake Villa Subdivision Code § 11-1-5-J-6. The improvement will likely cost between $500,000 and $1,000,000, requiring an inspection fee of $17,500 plus 3% of the estimated cost above $500,000.

5. Prior to execution of the Final Plat by the Village, the Plaintiffs agree to pay the fees in lieu of land dedication of $100,250.00.

6. The Plaintiffs further agree to pay all applicable school impact fees at the time each building permit is issued as provided in Lake Villa Subdivision Code § 11-1-4.G.

7. Prior to execution of the Final Plat by the Village, the Plaintiffs agree to provide to the Village an irrevocable letter of credit to secure the completion of all public improvements on the property, in an amount equal to one hundred twenty-five percent (125%) of the estimated cost of construction of the required improvements as determined by the Village Engineer, in the form required by the Village or as otherwise approved by the Village Attorney. No building permits or occupancy permits shall be issued, and the Plaintiffs shall not begin construction of the public improvements, until the plat is recorded and until submitting said irrevocable letter of credit. In the event that the amount of the letter of credit should become less than the amount actually estimated by the Village Engineer to be required to complete the public improvements, the Plaintiffs shall, upon written notice, promptly increase the amount of the letter of credit to the amount determined to be sufficient by the Village Engineer.

8. The parties recognize that there is a water shortage in some part of the Village, however, a water study done for the area concluded that the Property and surrounding area was acceptable for water service, and the Village agrees to promptly issue a water tap-on permit when requested by the Plaintiffs without requiring any additional wells or storage facilities to be built.

9. Promptly upon the execution of this Agreement, Plaintiffs shall dismiss the Litigation with prejudice as to the Defendants. The parties shall pay their own costs, including attorneys' fees, in any way relating to the Litigation or the subject matter of the Litigation, and each party hereby waives any right they may have to seek any award of attorneys' fees or costs against any other party hereto, their agents or attorneys, in connection with the Litigation. The Plaintiffs agree that they will receive no monies in the form of damages from the Defendants.

10. The Plaintiffs, and for all their representatives, predecessors, successors and assigns, do hereby jointly and severally release the Defendants and their heirs, legal representatives, officers, servants, agents, employees, attorneys, contractors, successors and assigns, from any and all manner of claims, debts, liabilities, causes of action, damages, demands or suits of any kind, from the beginning of the world to the date hereof, including costs and expenses of litigation, or any loss or damage to business or property, whether recoverable at common law or under the United States Constitution, including, but not limited to, claims under or pursuant to 42 U.S.C. Sections 1983 and 1988, or under any

statutes or laws of the United States of America, the State of Illinois, the County of Lake or the Village of Lake Villa, whether known or unknown at the present time, which they may now have or have ever had or may hereafter have by reason of the conduct, actions or omissions of the Defendants, or anyone acting by, for or through them prior to and including the date of this Settlement Agreement, except for the obligations set forth in this Settlement Agreement. The Plaintiffs further agree to indemnify and save harmless the Defendants from and against all claims advanced whatsoever on account of, or in anyway arising from or relating to, said occurrence or occurrences and/or its results to both persons and property.

11. The parties and their respective attorneys acknowledge that settlement of this matter is made to avoid the time, uncertainty and expense of further litigation and in the interest of judicial economy. Thus, it is agreed by both parties that this Settlement Agreement does not constitute an admission by either party regarding the existence or non-existence of liability, nor does the Settlement Agreement constitute an admission by either party that any of the allegations in the Litigation are true or that any action relating to the Plaintiffs in any way was wrongful or unlawful in any manner whatsoever, and shall not be construed as any determination of the underlying merits of this claim. The Defendants deny any liability, any wrongdoing, or any amounts owing with respect to any actions between the Plaintiffs and the Defendants.

12. The Plaintiffs agree that, except as provided herein, the development of the Property shall occur in accordance to and comply with all ordinances, codes and regulations

of the Village, including but not limited to the Village Zoning Ordinance and Subdivision Control Ordinance and the Village Building Code, including, without limitation, all provisions in said ordinances, codes and regulations that relate to the payment of fees and expenses such as, but not limited to, application fees and professional expenses incurred by the Village, and impact fees. The Plaintiffs acknowledge the validity of said existing ordinances and shall not contest the validity thereof in any legal or administrative proceeding. The Village reserves the right to amend its zoning ordinance, subdivision regulations, development standards, building codes and applicable codes and ordinances affecting the Property at any time as may be reasonably necessary for the protection of the public health, welfare and safety by general ordinance amendments applicable to development of all property in the Village, but no such amendment of any ordinance afore described shall be discriminatory in its effect upon the development of the Property.

13. The Plaintiffs and their attorney, Sebastian Rucci, shall not issue any directives, requests or other communications with the Village of Lake Villa regarding the attorney/client relationship between Lake Villa and attorney John Mullen. Further, Plaintiffs and their attorney, Sebastian Rucci, shall not communicate with any other municipal client of attorney John Mullen in which such communication in any way interferes with the attorney/client relationship between attorney John Mullen and the respective municipal entity.

14. This Settlement Agreement and any documents that may be executed hereunder, contain the entire agreement between Plaintiffs and Defendants with regard to the settlement of this Litigation, and shall be binding upon and inure to the benefit of the parties hereto, jointly and severally, and the heirs, executors, administrators, personal representatives, successors and assigns of each.

15. This Settlement Agreement is entered into in the State of Illinois and shall be construed and interpreted in accordance with its laws. In the event of any conflict between this Settlement Agreement and any codes, ordinances, rules or regulations of the Village, the provisions of this Settlement Agreement shall prevail and govern to the extent of any such conflict or inconsistency. However, where this Settlement Agreement is silent, the codes, ordinances, rules or regulations of the Village shall apply and govern. Terms contained herein shall not be construed against a party merely because that party is or was the principal drafter.

16. Each party forever waives any right such party has or might subsequently have to contest the validity or enforceability of this Settlement Agreement or any provision hereof.

17. This Settlement Agreement shall be specifically enforceable by either of the parties or their respective successive interest by an action at law or in equity before a court of competent jurisdiction, including, but not limited to, an action for specific performance, declaratory judgment, injunctive relief or mandamus to enforce all of their rights under this Settlement Agreement, provided that in no event shall the parties or any of their officers, agents or employees be liable for monetary damages in connection therewith. In any action to enforce or interpret this Settlement Agreement, the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs, to be paid by the non-prevailing party, as such court deems fit and appropriate.

18. In entering into this Settlement Agreement, the parties represent that they have had sufficient time to consider the terms of this Agreement, that they have relied upon the advice of their respective counsel, who are attorneys of their own choice, that the terms of

this Settlement Agreement have been completely read, interpreted and explained to them by their respective attorneys, and that those terms are fully understood and voluntarily accepted by them.

19. Each of the parties represents and warrants that no promise or inducement has been offered or made to pay any further consideration for the execution of this Settlement Agreement except as set forth herein, and that this Settlement Agreement contains each and every express promise and obligation between the parties, without regard to any statement or representation made by either party, or any person or persons acting on behalf of any of them.

20. This Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, agents, attorneys, contractors, legal representatives, successors and assigns. In addition, the covenants, conditions and restrictions created by this Settlement Agreement shall attach to and run with the Property and shall be binding on every person who may hereafter come into ownership, occupancy or possession of any portion of the Property. To effect the foregoing, this Settlement Agreement may be recorded by either party in the Office of the Recorder of Deeds of Lake County, Illinois, promptly after execution, and the parties shall execute any additional documents necessary to effect the recording of this Settlement Agreement.

21. The parties agree to cooperate fully to execute a Stipulation to Dismiss and any and all supplementary documents and to take all additional actions which are consistent with and which may be necessary or appropriate to give full force and effect to the basic terms and intent of this Settlement Agreement.

IN WITNESS WHEREOF, the undersigned have hereunto set their hand and seal this day of 13th, October 2004.

PLAINTIFFS:

CAMPUS INVESTMENTS, INC.

By: ______________________
GREG WALLER, president

______________________
GREG WALLER

______________________
LORRAINE ZIMMERMAN

DEFENDANTS:

______________________
JOYCE FRAYER

______________________
JAMES McDONALD

______________________
BILL EFFINGER

______________________
ROBERT RAUKOHL

DEFENDANTS:

VILLAGE OF LAKE VILLA

By: ______________________
FRANK LOFFREDO, Mayor

______________________
Attest: ALICE BROWNLEE, Village Clerk

______________________
FRANK M. LOFFREDO

______________________
DAVID HARTWIG

______________________
ROBERT STREICHER

______________________
DAVID DYKSTRA

______________________
JOHN MULLEN

# EXHIBIT A

# LAKE VISTA

**A Subdivision of a Tract of land of the West Half of the East Half of the Northeast Quarter of the Northeast Quarter of Section 4, Township 45 North, Range 10 East of the Third Principal Meridian in the Village of Lake Villa, in Lake Country, Illinois**

LEGEND







## LOCATION MAP

**NOTE:** All site work, grading and paving operations, and all roadway and street construction shall be done in accordance with the Standard Specifications for Road and Bridge Construction in Illinois, adopted July 1, 1988, and all revisions thereto. All sanitary sewer construction shall be in accordance with the Standard Specifications for Water and Sewer Main Construction in Illinois, fourth edition, dated May 1986, and all revisions thereto.

**BENCHMARKS:**

The source benchmark for this topography is:
RM 037-5 Chiseled square cut in the center of a concrete culvert headwall, approximately 75 feet Southeast of the intersection of Lake Avenue and State Route 83 as shown on FEMA Map Number 17097C 0037 F.
Elevation 785.32

The on site benchmark is: The Northeast corner of Concrete Lift-Station located on the South side of Grand avenue approximately 118 feet East of the Northwest corner of this property.
Elevation 791.35

| | INDEX OF SHEETS |
|---|---|
| 1 | COVER SHEET |
| 2 | FINAL SUBDIVISION PLAT |
| 3 | SITE PLAN |
| 4 | GRADING EROSION CONTROL PLAN |
| 5 | SEWER & STREET PROFILES |
| 6 | EROSION CONTROL DETAILS |
| 7 | EROSION CONTROL NOTES |
| 8 | TREE PLAN |
| 9 | LANDSCAPE PLAN |

**SITE INFORMATION:**
Property Address = 725 Grand Avenue
Total Area Subdivided = 10 ac
Number of Dwelling Units = 30
Gross Density = 30/10 = 3 units/ac
Proposed Use: Residential
Building Type = Single Family Residential

**ZONING INFORMATION:**
Min. Lot Area = 10,500 sq ft
Min. Front Bldg. Setback = 20 feet
Min. Side Yard Setback = 8 feet
Min. Rear Yard Setback = 20 feet

## LAKE VISTA COVER SHEET

*Engineer*
GARDNER ENG. LLC.
*4 Meppen Drive*
*St. Louis, MO 63128*
*Telephone (314) 842-8800*
*Facsimile (314) 842-4232*

*Developer*
CAMPUS INVESTMENTS INC.
*814 Main Street, Suite E*
*Lafayette, IN 47901*
*Telephone (765) 430-0187*
*Facsimile (765) 429-8383*

*June 29, 2004*

FINAL SUBDIVISION PLAT

# LAKE VISTA

Scale: 1" = 50'

**A Subdivision of a Tract of land of the West Half of the East Half of the Northeast Quarter of the Northeast Quarter of Section 4, Township 45 North, Range 10 East of the Third Principal Meridian in the Village of Lake Villa, in Lake Country, Illinois**




OWNERS CERTIFICATE

STATE OF ILLINOIS ) SS.
COUNTY OF LAKE )

EASEMENT SCRIPT

SCHOOL DISTRICT CERTIFICATE

VILLAGE CERTIFICATES

DISTRICT ENGINEER'S ACCESS CERTIFICATE

COUNTY CLERK TAX CERTIFICATE

# LAKE VISTA
## FINAL SUBDIVISION PLAT

Engineer
GARDNER ENG. LLC
4 Meppen Drive
St. Louis, MO 63128
Telephone (314) 842-0800
Facsimile (314) 842-4252

Developer
CAMPUS INVESTMENTS INC.
814 Main Street, Suite E
Lafayette, IN 47901
Telephone (765) 430-0187
Facsimile (765) 429-8363

June 29, 2004

PAGE 2 of 9

# LAKE VISTA SITE PLAN







TYPICAL PAVEMENT SECTION

Not to Scale

**NOTES:**

All site work, grading and paving operations, and all roadway and street construction shall be done in accordance with the Standard Specifications for Road and Bridge Construction in Illinois, adopted July 1, 1988, and all revisions thereto.

**SITE INFORMATION:**

Property Address = 725 Grand Avenue
Total Area Subdivided = 10 ac
Number of Dwelling Units = 30
Gross Density = 30/10 = 3 units/ac
Proposed Use: Residential
Building Type = Single Family Residential

**ZONING INFORMATION:**

Min. Lot Area = 10,500 sq ft
Min. Front Bldg. Setback = 20 feet
Min. Side Yard Setback = 8 feet
Min. Rear Yard Setback = 20 feet




TYPICAL LOT

Engineer
GARDNER ENG. LLC
4 Meppen Drive
St. Louis, MO 63128
Telephone (314) 842-9600
Facsimile (314) 842-4232

Developer
CAMPUS INVESTMENTS INC.
814 Main Street, Suite E
Lafayette, IN 47901
Telephone (765) 430-0167
Facsimile (765) 426-8353

June 29, 2004


LAKE VISTA
GRADING & EROSION PLAN
June 29, 2004
PAGE 4 of 9
GRAND AVENUE
S89° 59'07"E
LAKE VIEW HILLS SUBDIVISION
BREEZE COURT
LAKE VILLA HILLS
MONICA DRIVE
ROSELLE CO
SHEEHAN'S SUBDIVISION
SHEEHAN
DET. POND
N0° 23' 52"E 1346.51'
S0° 27' 39"W 1344.65'
S89°41'39"W 330.36'
Scale: 1" = 50'
SWALE DETAIL
BENCHMARKS:
The source benchmark for this topography is: RM 037-5 Chiseled square cut in the center of a concrete culvert headwall, approximately 75 feet Southeast of the intersection of Lake Avenue and State Route 63 as shown on FEMA Map Number 17097C 0037 F.
Elevation 785.32
The on site benchmark is: The Northeast corner of Concrete Lift-Station located on the South side of Grand avenue approximately 118 feet East of the Northwest corner of this property.
Elevation 791.35
GRADING NOTES

# LAKE VISTA
## SEWER & STRET PROFILES




SANITARY SEWER PROFILES




STORM SEWER PROFILES

**SEWER NOTE:** All sewer construction shall be in accordance with the Standard Specifications for Water and Sewer Main Construction in Illinois, fourth edition, dated May 1986, and all revisions thereto.




STREET PROFILE LAKE VISTA DRIVE

Engineer
GARDNER ENG. LLC
4 Meppen Drive
St. Louis, MO 63128
Telephone (314) 842-9800
Facsimile (314) 842-4232

Developer
CAMPUS INVESTMENTS INC.
814 Main Street, Suite E
Lafayette, IN 47901
Telephone (765) 430-0187
Facsimile (765) 426-6363

June 29, 2004




# LAKE VISTA
## EROSION CONTROL DETAILS

Engineer
GARDNER ENG. LLC
4 Meppen Drive
St. Louis, MO 63128
Telephone (314) 842-8600
Facsimile (314) 842-4232

Developer
CAMPUS INVESTMENTS INC.
814 Main Street, Suite E
Lafayette, IN 47901
Telephone (765) 430-0187
Facsimile (765) 428-8383

June 29, 2004

PAGE 6 of 9

# LAKE VISTA
## SOIL & EROSION CONTROL NOTES

Engineer
GARDNER ENG. LLC.
4 Meppen Drive
St. Louis, Missouri, 63128
Telephone (314) 842-9600
Facsimile (314) 842-4232

Developer
CAMPUS INVESTMENTS INC.
614 Main Street, Suite E
Lafayette, IN 47901
Telephone (765) 430-0187
Facsimile (765) 429-6363

June 29, 2004



**EROSION AND SEDIMENT CONTROL PLAN NOTES**

Only limited disturbance will be permitted to provide access for grading and [illegible], but not to construct these BMPs.

Erosion and sediment BMPs must be constructed, stabilized, and functional before site disturbance begins within the tributary areas of these BMPs.

After final site stabilization has been achieved, temporary erosion and sediment BMPs must be removed. Areas disturbed during removal of the BMPs must be stabilized immediately.

Stockpile heights must not exceed 35 feet. Stockpile slopes must be 2:1 or flatter.

Until the site is stabilized, all erosion and sediment BMPs must be maintained properly. Maintenance must include inspections of all erosion and sediment BMPs after each runoff event and on a weekly basis. All preventative and remedial maintenance work, including clean out, repair, replacement, regrading, reseeding, remulching and renetting must be performed immediately. If erosion and sediment control BMPs fail to perform as expected, replacement BMPs, or modifications of those installed will be required.

**TEMPORARY SEEDING SPECIFICATIONS:**

SITE PREPARATION: All areas to be seeded shall be loosened to a depth of at least two inches by mechanical means, or as approved by the landscape architect. Mulch seeded areas immediately after seeding. Seed all disturbed areas with the temporary seed mixture except those areas shown to be seeded with steep slope mixture, unless otherwise noted on the drawings.

SEED MIXTURE: Seed mixture shall bear a guaranteed statement of analysis and shall be composed of the following varieties and mixed in the proportions specified. Temporary Seed Mixture = Ryegrass Var. [illegible]: Proportion by Weight = 100 %, Minimum Purity = 98%, Minimum Germination = 90%.

SEEDING RATE: Temporary Seeding Shall Be Applied at the Rate of [illegible] Pounds per One Thousand (1,000) Square Yards.

LIMESTONE: Raw ground agricultural limestone containing more than 90 percent calcium carbonates (adjust pH levels to 6.5 to 7.0). Apply at a rate of 2 tons/ac.

COMMERCIAL FERTILIZERS: Use 1000 lbs/ac of 10-20-20 [illegible] mixed into seedbed prior to seeding, or mixed with seed when hydroseeding.

MULCH: Clean straw, whose straw shall be free from mature seed-bearing stalks or roots of prohibited or noxious weeds. Apply at a rate of [illegible] ([illegible]). Take precaution to stabilize the mulch until the vegetative cover is established.

INSPECTION AND MAINTENANCE: Newly seeded areas need to be inspected frequently to ensure the grass is growing. Areas which fail to establish cover adequate to prevent sheet and rill erosion will be reseeded as soon as such areas are identified. Spot seeding can be done on small areas to fill in bare spots where grass did not grow properly. If the seeded area is damaged due to concentrated runoff, additional practices may be needed. Temporary vegetated areas will be maintained until permanent vegetation or other erosion control practices can be established.

**STEEP SLOPE SEEDING SPECIFICATIONS (Slopes Steeper than 3:1):**

APPLICATION: Seed all areas with a slope steeper than 3:1 or as shown, unless noted otherwise on the drawings.

SEED MIXTURE: Steep Slope Seed Mixture (INDOT Type R). Steep slope seed mixture shall be composed of the following varieties and mixed in proportions specified: Tall Fescue (Festuca arundinacea var. Kentucky 31): Proportion by Weight = 70 %; Minimum Purity = 95%; Minimum Germination = 85%; Birdsfoot Trefoil Mixture (Lotus Corniculatus) [illegible]: Proportion by Weight = 20%; Minimum Purity = 98%; Minimum Germination = 85%; Redtop (Agrostis Alba): Proportion by Weight = 10 %; Minimum Purity = 90 %; Minimum Germination = 80%.

SEEDING RATES: Steep slope seeding shall be applied at a rate of [illegible] pounds per one thousand square yards [illegible]. [illegible]

TOPSOIL: Minimum of three inches of topsoil shall be provided on slopes steeper than 3:1.

LIMESTONE: Raw, ground agricultural limestone containing more than 90 percent calcium carbonates (adjust pH levels to between 6.5 to 7.0). Apply at a rate of [illegible].

COMMERCIAL FERTILIZERS: Use 1000 pounds of 10-20-20 per acre [illegible] or mixed with seed when hydroseeding.

INOCULANT: [illegible]

MULCH: Clean straw, whose straw shall be free from mature seed-bearing stalks or roots of prohibited or noxious weeds. Apply at a rate of [illegible] per 1,000 square feet [illegible]. Take precaution to stabilize mulch until the vegetative cover is established. Straw shall be crimped, tackified, netted or otherwise anchored.

INSPECTION AND MAINTENANCE: Newly seeded areas need to be inspected frequently to ensure the grass is growing. If the seeded area is damaged due to runoff, additional conservation measures may be needed. Spot seeding can be done on small areas to fill in bare spots where grass did not grow properly.

**PERMANENT SEEDING SPECIFICATIONS:**

SITE PREPARATION: Grade as necessary to bring subgrade to a true, smooth slope parallel to and at [illegible] below finish grade. Place topsoil or specified soil to a depth sufficiently greater than [illegible] so that after settlement and light rolling the complete work will conform to lines, grades and elevations shown. Fertilizer and agricultural limestone shall be thoroughly incorporated into the soil by rototilling or other method to a minimum depth of four inches. The entire surface shall then be regraded and rolled. Areas to be seeded shall then be loosened to a depth of two inches. Seeding shall be done in two separate operations. The second seeding shall be at [illegible] to the first seeding and lightly raked into the soil. Mulch seeded areas immediately after seeding.

TIMING: Apply permanent seeding on areas left dormant for 1 year or more. Apply permanent seeding when no further disturbance is planned. To determine optimum seeding schedule, consult a local agronomist or erosion control specialist. Apply permanent seeding before seasonal rains or freezing weather is anticipated. Use dormant seeding for late fall or winter seeding schedules.

SEED MIXTURE: Permanent Seeding Mixture (INDOT Type B). Seed mixture shall bear a guaranteed statement of analysis and shall be composed of following varieties and mixed in proportions specified. Perennial ryegrass mixture (Two varieties) – a combination of improved certified varieties [illegible]: Proportion by Weight = 20 %; Minimum Purity = 98%, Minimum Germination = 90%; Creeping Red Fescue (or Chewings Fescue): Proportion by Weight = 30 %; Minimum Purity = 98%; Minimum Germination = 85%; Kentucky Bluegrass Mixture (TOW Varieties) – Combination of certified varieties [illegible]: Proportion by Weight = 50%; Minimum Purity = 98%; Minimum Germination = 80%.

SEEDING RATE: Permanent seeding shall be applied at a rate of 21 pounds per 1,000 square yards.

TOPSOIL: Minimum of three inches of topsoil shall be provided on all lawn areas.

LIMESTONE: Raw, ground agricultural limestone containing more than 90 percent calcium carbonates (adjust pH levels to 6.5 to 7.0). Apply at a rate of [illegible] (275 lb/1,000 sf).

COMMERCIAL FERTILIZERS: Use 1000 lbs/ac of 10-20-20 [illegible] mixed into seedbed prior to seeding, or mixed with seed when hydroseeding.

INOCULANT: [illegible]

MULCH: Mulch clean straw or wood fiber. Shall be free from mature seed-bearing stalks or roots of prohibited or noxious weeds. Apply at a rate of 150 pounds per 1,000 square feet [illegible] until the vegetative cover is established.

INSPECTION AND MAINTENANCE: Newly seeded areas need to be inspected frequently to ensure the grass is growing. If the seeded area is damaged due to runoff, additional conservation measures may be needed. Spot seeding can be done on small areas to fill in bare spots where grass did not grow properly.

**MAINTENANCE SCHEDULE:**

All devices should be inspected weekly and after every runoff event. If during these inspections, any device is found to be clogged, damaged, full (1/2 full of silt) or not fully operational, the device shall be cleaned of all debris, and all sediment shall be removed, spread onsite and seeded for stabilization. The sediment shall be the responsibility of the grading contractor. All repairs must be completed within seventy-two hours of discovery.

Inspect ROCK CONSTRUCTION ENTRANCES weekly and after every runoff event. Look for the following: (i) Stone [illegible]; if found, add stone to bring to specified dimensions; (ii) Sediment on Public Roadway; if found, sweep material back to project. Do not wash roadway with water.

Inspect SEDIMENT BASINS weekly and after every runoff event. Look for the following: (a) Sediment Accumulation above designated cleanout level; if found, remove sediment and dispose on site.

Inspect FILTER FABRIC FENCE weekly and after every runoff event. Look for the following: (a) Undermining of fence; if found, replace failed section with rock filter outlet; (b) Fence collapsing; if found, check fence post size and spacing, gauge of wire mesh and fabric strength, also, check drainage area, slope length, and gradient behind barrier. Correct any substandard conditions; (c) Torn fabric; if found, replace with continuous piece of fabric from post to post. Securely anchor with proper staples; (d) Runoff escaping around Barrier; if found, extend fence; (e) Sediment level near top Of fence; if found, remove sediment when level reaches half of fence height.

Inspect INLET PROTECTION weekly and after every runoff event. Look for the following: (a) Sediment accumulation; if found, remove sediment and dispose on site; (b) Runoff escaping around barrier; if found, remold barrier.

Inspect RIP-RAP APRONS weekly and after every runoff event. Look to see if the apron washed away, and if found, reshape as necessary and replace with larger size riprap.

Inspect ROCK FILTER weekly and after every runoff event. Look for the following: (a) Clogged filter stone; if found, replace; and (b) Sediment accumulation; if found, remove sediment when Level reaches half of filter height.

Inspect JUTE MAT weekly and after every runoff event. Look for the following: (a) Loss of protective Lining; if found, reshape as necessary and replace fabric; and (b) Torn/punctured fabric; if found, overlap with continuous Piece of matting. Securely Anchor with proper staples.

Inspect VEGETATION weekly and after every runoff. Look for the following: (a) Sediment at toe of slope; if found, check for top-of-slope diversion install if needed; (b) Rills and gullies forming; if found, fill rills and reregrade gullied slopes; and (c) Bare soil patches; if found, reseed, fertilize, and mulched.

**EROSION CONTROL BLANKETS AND MATS**

Site Preparation: Remove all rocks, clods, vegetative or other obstructions so that the installed blankets or mats will have direct contact with the soil. Prepare seedbed by loosening 2-3 inches of topsoil above final grade. Incorporate amendments, such as lime and fertilizer, into soil according to soil test and the seeding plan.

Seeding: Seed area before blanket installation for erosion control and revegetation. Seeding after mat installation is often specified for turf reinforcement application. When seeding prior to blanket installation, all check slots and other areas disturbed during installation must be reseeded. Where soil filling is specified, seed the matting and the entire disturbed area after installation and prior to filling the mat with soil.

Anchoring: U-shaped wire staples, metal geotextile stake pins or triangular wooden stakes can be used to anchor mats to the ground surface. Wire staples should be a minimum of 11 gauge. Metal stake pins should be 3/16 inch diameter steel with a 1 1/2 inch steel washer at the head of the pin. Wire staples and metal stakes should be driven flush to the soil surface. All anchors should be 6-8 inches long and have sufficient ground penetration to resist pullout. Longer anchors may be required for loose soils.

Installation on Slopes: Begin at the top of the slope and anchor the blanket in a 6 inch deep x 6 inch wide trench. Backfill trench and tamp earth firmly. Unroll blanket down slope in the direction of the water flow. The edges of adjacent parallel rolls must be overlapped 2-3 inches and be stapled every 3 feet. When blankets must be spliced, place blankets end over end (shingle style) with 6 inch overlap. Staple through overlapped area, approximately 12 inches apart. Lay blankets loosely and maintain direct contact with the soil – do not stretch. Blankets shall be stapled sufficiently to anchor blanket and maintain contact with the soil. Staples shall be placed down the center and staggered with the staples placed along the edges. Steep slopes, 1:1 to 2:1, require 2 staples per square yard. Moderate slopes, 2:1 to 3:1, require 1-2 staples per square yard (1 staple 3 ft o.c.). Gentle slopes require 1 staple per square yard.

Installation in Channels: Dig initial anchor trench 12 inches deep and 6 inches wide across the channel at the lower end of the project area. Excavate intermittent check slots, 6 inches deep and 6 inches wide across the channel at 25-30 foot intervals along the channel. Cut longitudinal channel anchor slots 4 inches deep and 4 inches wide along each side of the installation to bury edges of matting. Whenever possible extend matting 2-3 inches above the crest of channel side slopes. Beginning at the downstream end and in the center of the channel, place the initial end of the first roll in the anchor trench and secure with fastening devices at 1 foot intervals. Note: matting will initially be upside down in anchor trench. In the same manner, position adjacent rolls in anchor trench, overlapping the preceding roll a minimum of 3 inches. Secure these initial ends of mats with anchors at 1 foot intervals, backfill and compact soil. [illegible] Fold and secure all rolls of matting snugly into all transverse check slots. [illegible] Anchor through both layers of mat at 1 inch intervals, then backfill and compact soil. [illegible]
Shingle-lap spliced ends by a minimum of 1 foot with upstream roll on top to prevent uplifting by water or begin new rolls in a check slot. Anchor overlapped area [illegible] foot apart at 1 foot intervals. Place edges of outside mats in previously excavated longitudinal slots, anchor using prescribed staple pattern, backfill and compact soil. Anchor, fill and compact upstream end of mat in a 12 inch x 6 inch terminal trench. Secure mat to ground surface using U-shaped wire staples, geotextile pins or wooden stakes. Seed and fill turf reinforcement matting with soil, if specified.

Maintenance: All blankets and mats should be inspected periodically following installation. Inspect installation after significant rainstorms to check for erosion and undermining. Any failure should be repaired immediately. If washout or breakage occurs, reinstall the material after repairing the damage to the slope or drainageway.

**RIPRAP**

Before laying riprap and filter, prepare the subgrade to the required lines and grades shown on the plans. Compact any fill required in the subgrade to a density approximating that of the surrounding undisturbed material. Overfill depressions with riprap. Remove brush, trees, stumps, and other objectionable material. Cut the subgrade sufficiently deep so that the finished grade of the riprap will be at the elevation of the surrounding area. Channels should be excavated sufficiently to allow placement of the riprap in a manner such that the finished inside dimensions and grade of the riprap meet design specifications.
[illegible]

Maintenance: Properly designed and installed riprap requires very little maintenance. Riprap should be inspected periodically for scour or dislodged stones. Control of weed and brush growth may be needed in some locations.

**TEMPORARY SEDIMENT BASIN**

Construct the basin by excavating or building an embankment before any clearing or grading work begins. Areas under the embankment and any structural works shall be cleared, grubbed and stripped of any vegetation and rootmat as shown on the erosion and sediment control plan. In order to facilitate cleanout and restoration, the basin area shall be cleared, grubbed and stripped of any vegetation. A cut-off trench shall be excavated along the centerline of the earth fill embankment. The minimum depth shall be 2 feet (0.6 m). The cut-off trench shall extend up both abutments to the riser crest elevation. Fill material for the embankment should be clean mineral soil free of roots, woody vegetation, oversized stones, rocks or other objectionable material. The fill material shall contain sufficient moisture so that it can be formed by hand into a ball without crumbling. Fill material shall be placed in 6 inch (0.2 m) lifts, continuous layers over the entire length of the fill. Compaction shall be obtained by routing the hauling equipment over the fill so that the entire surface of each layer of the fill is traversed by at least one wheel or tread track of the equipment, or by the use of a compactor. The embankment should be constructed to an elevation of 10 percent higher than the design height to allow for settlement if compacting is achieved with hauling equipment. If compactors are used for compacting, the overbuild may be reduced to not less than 5 percent. The principle spillway riser shall be securely attached to the discharge pipe by welding all around. All connections shall be watertight. The pipe and riser shall be placed on a firm, smooth soil foundation. The connection between the riser and the riser base shall be watertight. Pervious materials such as sand, gravel or crushed stone shall not be used as backfill around the pipe or anti-seep collars. The fill material around the pipe spillway shall be placed in 4-inch layers and compacted under the shoulders and around the pipe to at least the same density as the adjacent embankment. A minimum of 2 feet of compacted backfill shall be placed over the pipe spillway before crossing it with construction equipment. Steel base plates shall have at least 2 1/2 feet of compacted earth, stone or gravel over them to prevent flotation. The emergency spillway shall not be installed in fill. Elevations, design width, and entrance and exit channel slopes are critical to the successful operation of the emergency spillway.
Baffles shall be constructed of 4 inch by 4 inch posts and of 4 foot by 8 foot - 1/2 inch exterior plywood. The posts shall be set at least 3 feet into the ground, no further apart than 8 feet center to center, and shall reach a height 6 inches below the riser crest elevation. The embankment and emergency spillway shall be stabilized with vegetation immediately following construction. Construction operations shall be carried out in such a manner that erosion and water pollution will be minimized. Local and state requirements shall be met concerning fencing and signs warning the public of hazards of soft sediment and floodwater.

Maintenance: Inspect weekly and after each rain. All damages caused by soil erosion or construction equipment shall be repaired before the end of each working day. Remove sediment when the sediment storage zone is half full. This sediment shall be placed in such a manner that it will not erode from the site. The sediment shall not be deposited downstream from the embankment or in or adjacent to a stream or floodplain. When temporary structures have served their intended purpose and the contributing drainage area has been properly stabilized, the embankment and resulting sediment deposit shall be leveled or otherwise disposed of in accordance with the approved erosion and sediment control plan.

**SILT FENCE INSTALLATION**

The soil should be sliced and the fabric mechanically installed into the soil. The height of a silt fence shall not exceed 36 inches. Storage height and ponding height shall never exceed 18 inches. To minimize erosion, install silt fence at the toe of a slope to slow velocity and to create a large storage area. The fence line shall follow the contour as closely as possible. The ends of the fence should be turned uphill. Steel support posts should be of steel, properly spaced and driven into compacted soil. Post spacing shall not exceed 6 feet. The filter fabric is stapled or wired directly to the posts. Filter fabric shall not be stapled to existing trees. Fabric should be attached to the posts with three diagonal ties. Silt fences placed at the toe of a slope shall be set at least 6 feet from the toe in order to increase ponding volume.

Maintenance: Silt fences and filter barriers shall be inspected weekly after each significant storm (1 inch in 24 hours). Any required repairs shall be made immediately. Sediment should be removed when it reaches 1/3 height of the fence or 9 inches maximum. The removed sediment shall conform with the existing grade and be vegetated or otherwise stabilized. Silt fences shall be removed when they have served their useful purpose, but not before the upslope area has been permanently stabilized and any sediment stored behind the silt fence has been removed.

**CURB INLET SEDIMENT BARRIERS**

Place the barriers on gently sloping streets where water can pond. The barriers must allow for overflow from a severe storm event. Slope runoff shall be allowed to flow over blocks and gravel and not be bypassed over the curb. A spillway shall be constructed with the sandbag structures to allow overflow. The sandbag should be of woven-type geotextile fabric since burlap bags deteriorate rapidly. The sandbags shall be filled with 3/4 inch drain rock or 1/4 inch pea gravel. The sandbags shall be placed in a curved row from the top of curb at least 3 feet into the street. The row should be curved at the ends, pointing uphill. Several layers of bags should be overlapped and packed tightly. Leave a one-sandbag gap in the top row to act as a spillway.

Bar Block and Gravel Type Barriers: Place two concrete blocks on their sides perpendicular to the curb at either end of the inlet opening. These will serve as spacer blocks. Place concrete blocks on their sides across the front of the inlet and abutting the spacer blocks. The openings in the blocks should face outward, not upward. Cut a 2 by 4 inch stud the length of the curb inlet plus the width of the two spacer blocks. Place the stud through the outer hole of each spacer block to help keep the front blocks in place. Place wire mesh over the outside vertical face (open ends) of the concrete blocks to prevent stone from being washed through the blocks. Use chicken wire, hardware cloth with 1/2 inch openings, or filter fabric. Place 3/4 - 1 1/2 inch gravel against the wire to the top of the barrier.

Maintenance: Inspect and clean barrier during and after each significant storm and remove sediment from behind sandbag structure after every storm. Any sediment and gravel shall be immediately removed from the traveled way of roads. The removed sediment shall be placed where it cannot enter a storm drain, stream, or be transported off site. If the gravel becomes clogged with sediment, it must be carefully removed from the inlet and either cleaned or replaced.

**YARD DRAIN SEDIMENT BARRIERS**

Straw Bale Barrier: Excavate a 4-inch deep trench around the inlet and make the trench as wide as a straw bale in order to embed the bales properly. Orient the straw bales with the bindings around the sides of the bales so the wire does not come in contact with the soil. Place bales lengthwise around the inlet and press the ends of adjacent bales together. The bales may be loosely joined if more gravel is utilized. Drive two 2 by 2 inch stakes or rebar through each bale to anchor the bale securely in place. Utilize 3/4-3 inch gravel to fill the void spaces between the bales if it is necessary to dewater the ponded area more rapidly.

Silt Fence Sediment Barrier: Support posts for a silt fence must be steel fence posts or 2 by 4 inch wood, length 3 foot minimum, spacing 3 foot maximum, with a top frame support recommended. Excavate a trench 4 inches wide and 6 inches deep and bury the bottom of the silt fence in the trench. Backfill the trench with gravel or soil. Compact the backfill well. The height of the silt fence shall be a 1.5 foot maximum, measured from the top of the inlet.

Gravel Doughnut: Keep the stone slope toward the inlet at 3:1 or flatter or use concrete blocks to help prevent the stone from being washed into the yard drain. A minimum 1 foot wide level area set 4 inches below the yard drain inlet crest will add further protection against the entrance of material. Stone on the slope toward the inlet should be 3 inches or larger for stability, and 1 inch or smaller on the slope away from the inlet to control flow rate. Wire mesh with 2 inch openings may be placed over the drain grating, but must be inspected frequently to avoid blockage by trash. If concrete blocks are used the openings should be covered with wire screen or filter fabric.

Maintenance: Inspect the barrier after each rain and promptly make repairs as needed. Sediment shall be removed after each significant storm (1 inch in 24 hours) to provide adequate storage volume for the next rain. The removed sediment shall be deposited in an area that will not contribute sediment off-site and can be permanently stabilized. For gravel filters: If the gravel becomes clogged with sediment it must be carefully removed from the inlet and either cleaned or replaced.


LAKE VISTA LANDSCAPE PLAN
GARDNER ENG. LLC
CAMPUS INVESTMENTS INC.
June 29, 2004
PAGE 9 OF 9
GRAND AVENUE
S89° 59'07"E 331.82'
DET. POND
LAKE BREEZE COURT
LAKE VIEW HILLS SUBDIVISION
KENZ COURT
MONICA DRIVE
ROSELLE COURT
LAKE VILLA HILLS
SHEEHAN'S SUBDIVISION
SHEEHAN DRIVE
S89°41'39"W 330.36'
Scale: 1" = 50'
LEGEND
Green Ash
Honey Locust
Redtwig Dogwood
Eastern Arborvitae

# EXHIBIT B

## EXHIBIT B

1. Sewer line must be located in street right of way;

2. Sewer profile must be completed to clarify that it can discharge into lift station or elsewhere;

3. Lift station easement must be shown on plat;

4. Plans must be amended to include village specifications for sewers, water, streets, and lights;

5. Must add streetlights to plans pursuant to Village codes and ordinances;

6. Plans must show detention pond on lot 4 or 5 in Lake Villa Hill subdivision;

7. Must add language to plat "hereby dedicated for street purposes" to dedicate Lake Vista Drive to the Village for a public street and add acceptance of dedication certificate for the Village to sign;

8. Plat must be on mylar;

9. Plans must show stubs from each lot to sewer and water mains;

10. Legal description must reference to nearest quarter section;

11. Plat must be modified to show front yard setbacks of thirty (30) feet;

12. Lot with detention pond must be marked as "Outlot A";

13. Must submit proposed covenants and restrictions for review and approval;

14. Must show tree buffer yard easement on Plat showing that trees will not be cut down on perimeter of subdivision and must add easement definition to plat which preserves the trees in the bufferyard;

15. Must provide bona fide opinion of probable cost estimate for public improvements to be approved by Village Engineer; Estimate to include: sanitary sewer, water main, storm sewer, paving, site clearing, grading, and erosion control, street lighting and signage, pond aeration, if applicable, and landscaping.

16. Must provide a signed statement of agreement pursuant to section 11-1-5-h of the Village Subdivision Control Ordinance.

17. Street specifications must be revised to conform with Village requirements;

18. Drainage certificate must be signed by owner and a registered professional engineer pursuant to 765 ILCS 205/2;

19. Must provide 12 foot asphalt driveway for emergency access, between lots 20 and 21 connecting Monica Court with the Lake Vista;

20. Must show minimum floor elevations;

21. Must provide crosswalk in location approved by Village Engineer.

22. Must add utility easements to Plat;

23. Must add drainage easements to Plat;

24. Surveyor must confirm that monuments have been set per the certificate on the Plat;

25. Landscape Plan must be modified to provide that trees will be at least 2 inch diameter at d.b.h.;

26. Street signs must be added to the Plans;

27. Fire hydrants must be added to the Plans;

28. Water line must be modified to permit looping from adjacent subdivision to the south.

# EXHIBIT C

**EXHIBIT C**

October 13, 2004

Mr. Glenn H. Westman
Lake County Stormwater Management Commission
333 B Peterson Road
Libertyville, Il 60048

RE: Lake Vista Subdivision, 725 Grand Avenue, Lake Villa, IL
*Waller et. al v. Lake Villa et al* (Case No 03 CV 7224)

Dear Mr. Westman:

The Village of Lake Villa has entered into a settlement agreement to resolve the litigation regarding the development of 725 Grand Avenue in Lake Villa. The settlement provides in part that the Village will approve a 30-lot subdivision on this property and will permit the filling in of the pond, subject to the plaintiff securing any required permits from SMC. This letter is sent to you at the direction of the Mayor and Board of Trustees.

Pursuant to the settlement, it is the determination of the Village that the pond at 725 Grand Avenue was a permitted excavations for the purpose of the permitted stormwater program, and may be filled, and that the pond is not an isolated wetland subject to the regulatory control of SMC. (WDO Appendix A: "Isolated Waters of Lake County exclude permitted excavations . . . constructed as part of a stormwater management system.")

The Village would ask that you concur in this finding and issue a no jurisdiction letter in connection with the filling of the pond. In the alternative, if SMC is unable to concur with the Village's determination, the Village would request that SMC promptly issue any necessary permit to allow the filling in of the pond.

Sincerely,
Alice Brownlee

Village Clerk

EXHIBIT 2

LAKE COUNTY

**STORMWATER MANAGEMENT COMMISSION**

October 26, 2004

Ms. Alyce Brownlee, Village Clerk
Village of Lake Villa
65 Cedar Avenue
P.O. Box 519
Lake Villa, Illinois 60046

Mr. Brett Bennett, P.E.
Village Enforcement Officer
Lake County Planning, Building & Development
18 N. County Street – 5th Floor Waukegan,
Illinois 60085-4356

Subject: Lake Vista Subdivision at 725 Grand Avenue
Village of Lake Villa, Lake County, Illinois

Dear Ms. Brownlee and Mr. Bennett:

On October 18, 2004, the Lake County Stormwater Management Commission (SMC) received a letter from the Village of Lake Villa regarding the subject development. With reference to the existing pond on the property, the letter states: "it is the determination of the Village that the pond at 725 Grand Avenue was a permitted excavation for the purpose of the permitted stormwater program, and may be filled, and that the pond is not an isolated wetland subject to the regulatory control of SMC. (WDO Appendix A: "Isolated Waters of Lake County exclude permitted excavations...constructed as part of a stormwater management system."). The letter requested a concurrence on this determination from SMC.

**SMC concurs with the Village's determination that the subject pond is excluded from the current WDO definition of *Isolated Waters of Lake County* on the basis of being a permitted excavation for stormwater management purposes. Therefore, no isolated wetland approval is required from SMC for the proposed development.**

Our concurrence is based on a review of the following information:

- Affidavit from Karl Zimmermann, previous property owner, dated February 26, 2004, stating the subject pond was excavated sometime between 1973-1975 under a Department of Agriculture 50/50 shared expense program in anticipation of satisfying routine stormwater management requirements for a future subdivision.
- National Wetland Inventory Map, Antioch, Illinois Quadrangle, by U.S. Fish & Wildlife Service, circa 1984, classifying the subject pond as "POWG" (palustrine, open water, intermittently exposed, excavated).
- Aerial photographs from Lake County Soil & Water Conservation District dated 1967 and 1974, with no pond visible on the site.
- Aerial photograph from SMC dated 1990 with excavated pond visible.

*Alyce Brownlee & Brett Bennett*
*October 26, 2004*
*Lake Vista Subdivision, Lake Villa*
*SMC # 03-24-127*
*Page 2 of 2*

A Watershed Development Permit (WDP) from the Village of Lake Villa is required for the proposed development. Lake Villa is a certified community for the standard (stormwater management) provisions of the WDO. SMC's approval of the base flood elevation (BFE) for the non-riverine flood-prone area on the site (i.e., the existing pond) will be required before a WDP can be issued by the Village, if the tributary drainage area to the pond is greater than 20 acres. If applicable, please contact Ms. Minal Hahm, SMC's permit engineer, at (847)918-5263 regarding the BFE approval process.

If you have any questions, please do not hesitate to call us at (847)918-5260.

Sincerely,

LAKE COUNTY STORMWATER MANAGEMENT COMMISSION

Michael D. Warner, P.E., CFM
Chief Engineer

Glenn H. Westman, PWS, CWS, CFM
Senior Wetland Specialist

cc: Honorable Frank Loffredo, Mayor, Village of Lake Villa

U:/regulatoryprogram/permits/03-24-127/letter_102604

EXHIBIT 3

**Applied**Technologies

Applied Technologies, Inc.
300 North Milwaukee Avenue, Suite E
Lake Villa, Illinois 60046
Fax 847-265-7327
Telephone 847-265-7325

April 21, 2005

John Mullen
Law Office of John Mullen
14048 Petronella Drive
Suite 202
Libertyville, IL

Subject: Lake Vista Subdivision
Lake Villa, IL

Dear John:

We have received revised engineering plans dated April 18, 2005 from Sebastian Rucci regarding the Lake Vista Subdivision.

Regarding the Agreement and conditions set forth in Exhibit B, our review findings currently are as follows:

1. *Sewer line must be located in street right of way.* **This condition has been met.**
2. *Sewer profile must be completed to clarify that it can discharge into lift station or elsewhere.* **This condition has been met.**
3. *Lift station easement must be shown on the plat.* **This condition has been met.**
4. *Plans must be amended to include village specifications for sewers, water, streets and lights.* **This condition has been met.**
5. *Must add Streetlights to Plans pursuant to Village Codes and Ordinances.* **This condition has been met.**
6. *Plans must show detention pond on Lot 4 or 5 in Lake Villa Hills Subdivision.* **This condition has been met.**
7. *Must add language to plat "hereby dedicated for street purposes" to dedicate Lake Vista Drive to the Village for a public street and add acceptance of dedication certificate for the Village to sign.* **This condition has not been met.**
8. *Plat must be on Mylar.* **This condition has not been met.**
9. *Plans must show stubs from each lot to sewer and water mains.* **This condition has been met.**
10. *Legal description must reference nearest quarter section.* **This condition has been met.**
11. *Plat must be modified to show front yard setbacks of 30 feet.* **This condition has been met.**
12. *Lot with detention pond must be marked as "Outlot A".* **This condition has been met.**
13. *Must submit proposed covenants and restrictions for review and approval.* **Reference comments from the Village Attorney.**

J:\3703\WORDPROC\COMM\CORR_OUT\Mullen 050421.doc

14. *Must show tree buffer yard easement on plat showing that trees will not be cut down on perimeter of subdivision and must add easement definition to plat, which preserves the trees in the buffer yard.* **This condition has been met.**
15. *Must provide bona fide opinion of probable cost estimate for public improvements to be approved by the Village Engineer; estimate to include sanitary sewer, water main, storm sewer, paving, site clearing, grading and erosion control, street lighting and signage, pond aeration, if applicable, and landscaping.* **This condition has been met.**
16. *Must provide a signed statement of agreement pursuant to Section 11-1-5-h of the Village Subdivision Control Ordinance.* **This condition has not been met.**
17. *Street specifications must be revised to conform with Village requirements.* **This condition has been met.**
18. *Drainage certificate must be signed by owner and a registered professional engineer pursuant to 765 ILCVS 205/2.* **Reference comments from the Village Attorney.**
19. *Must provide 12-foot asphalt driveway for emergency access, between lots 20 and 21 connecting Monica Court with the Lake Vista.* **This condition has been met.**
20. *Must show minimum floor elevations.* **This condition has been met.**
21. *Must provide crosswalk in location approved by Village Engineer.* **This condition has been met**
22. *Must add utility easements to the plat.* **This condition has been met.**
23. *Must add drainage easements to the plat.* **This condition has been met.**
24. *Surveyor must confirm that monuments have been set per the certificate on the plat.* **This condition has been met.**
25. *Landscape Plan must be modified to provide that trees will be at least 2-inch diameter at d.b.h.* **This condition has been met.**
26. *Street signs must be added to the Plans.* **This condition has been met.**
27. *Fire hydrants must be added to the plans.* **This condition has been met.**
28. *Water line must be modified to permit looping from adjacent subdivision to the south.* **This condition has been met.**

On page 8, between MH #20 and MH#21 the pipe material designation on the storm sewer should be changed from PVC to reinforced concrete. This is a previous comment that still has not been addressed.

We are prepared to sign the plat, if all of our aforementioned conditions are met.

Should you have any additional comments, please contact this office.

Sincerely,

Keith K. Corso, P.E.

Cc: Mayor Frank Loffredo