**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAMPUS INVESTMENTS, INC., an Ohio corporation, | ) | |
| | ) | Case No. 05-CV-3877 |
| Plaintiff | ) | |
| v. | ) | |
| | ) | Judge: Hon. Samuel Der-Yeghiayan |
| VILLAGE OF LAKE VILLA, ILL. | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFFS PROPOSED FINDINGS OF FACTS & CONCLUSIONS OF LAW

COMES NOW the Plaintiff, Campus Investments, Inc. and hereby submits it's proposed findings of facts and conclusions of law.

## PROCEDURAL BACKGROUND

This is a diversity action brought by the Plaintiff Campus Investments, Inc. an Ohio corporation, ("Campus Investments") against the Village of Lake Villa, an Illinois municipal corporation ("Village"). This case arises from a dispute between the parties over the right to subdivide 10 acres into 30 residential lots. The parties were previously involved in twelve months of litigation in *Waller v Village of Lake Villa*, Case No. 03 CV 7224 (N.D. Ill 2004) which ended in a settlement agreement permitting the development of the land into 30 lots.

There is now a dispute over whether the Village has breached it's promises under the settlement agreement. The parties are in agreement on basically everything, but conflict in one material respect. Campus Investments position is that they have complied with all the terms of the settlement and should be allowed to start construction. The Village's position is that Campus Investments must also comply with the county's watershed ordinance and obtain approval from their consultant before they can proceed to construction.

Campus Investments filed a six count Complaint (Docket # 1) but has since dismissed Counts 4-6. (Docket # 8). Only three equitable, non-jury, claims remain. Count 1 (Specific Performance) seeks an order making the Village specifically perform its obligations under the Settlement Agreement. Count 2 (Declaratory Relief) seeks a declaration that the April 18, 2005 plans complied with the Settlement; Count 3 (Injunctive Relief) seeks a preliminary injunction, enjoining Lake Villa from refusing to permit the construction of the subdivision.

Campus Investments filed a motion for preliminary injunction and motion to consolidate the hearing with the trial on the merits. The Village stipulated to the consolidation, which advanced the trial with the preliminary injunction hearing pursuant to Fed.R.Civ.P. 65(a)(2). See *Hakim v. Payco-General Am. Credits*, 272 F.3d 932, 935 (7th Cir. 2001) (If a court has "reasonable confidence that it knows what the contract means, it ought not put the litigants (and the trier of fact) to the bother, expense, and uncertainty of a trial or other evidentiary hearing.") A bench trial was held on July 12, 2005 pursuant to notice and after hearing the testimony of the witnesses and the arguments of counsel, and after reviewing the parties briefs, affidavits, exhibits and proposed findings, the court enters the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. Campus Investments, Inc. is an Ohio corporation with its principal place of business in Ohio.

2. The Village of Lake Villa is an Illinois municipal corporation. The mayor is Frank M. Loffredo ("Mayor"). It's Board of Trustees are David Dykstra, Bill Effinger, Joyce Frayer, David Hartwig, James McDonald, and Darlene Hall ("Trustees").

3. Campus Investments is the owner of 10 acres of real property located at 725 Grand Ave, in the Village ("Property"). The Property is surrounded by residential homes,

condominiums and apartments. Homes are contiguous to the west at a density of 2.99 lots per acre, to the east the density is 3.08 lots per acre, to the south are condominiums at 3.21 units/acre and to the north are apartments with a density of 10.8 units per acre.

4. On June 20, 2003, following Lake Villa's procedures for rezoning and subdividing property, Campus Investments submitted plans to subdivide the land into 30-lots.

5. On August 7, 2003, the Plan Commission voted to recommend denial of the request to re-zone and subdivide the land into 30-lots. On August 27, 2003, the Trustees voted to deny the request to re-zone and subdivide the land into 30 lots.

6. On October 14, 2003, Campus Investments filed a lawsuit in this Court, *Waller, et. al. v. Lake Villa*, No. 03CV-7224, seeking to develop the land into 30 lots and damages.

7. On January 14, 2004, Lake Villa voluntarily re-zoned the entire Village, placing the Property in a zone which permitted the 30-lot subdivision.

8. On March 19, 2004, Campus Investments once again submitted plans to subdivide the Property into a 30-lot subdivision. The Village did not act on the application.

9. On July 6, 2004, Campus Investments submitted construction plans for final plat approval of the 30-lot subdivision. The Village did not act on the application.

10. On September 8, 2004, the Village received a five-day notice letter from Campus Investments seeking final plat approval pursuant to 65 ILCS § 5/11-12-8. The Village did not act on the five day notice.

11. On September 17, 2004 Campus Investments filed an amended complaint in *Waller, et. al. v. Lake Villa*, No. 03CV-7224 seeking deemed approval of the plat, and damages. On Sep. 23, 2004, Campus Investments filed a motion for summary judgment seeking deemed approval of the plat. The motion was set for hearing on October 21, 2004.

12. On October 13, 2004, after 12 months of litigation, the Plaintiff and the Village and its officials entered into a Settlement Agreement (Complaint Exhibit 1). The Settlement Agreement was approved by Ordinance and recorded in the Lake County Recorder of Deeds. Pursuant to the Settlement Agreement Campus Investments had to comply certain engineering changes and obtain waiver to fill the pond by the County. Campus Investments also agreed to pay various fees and post a letter of credit before starting construction.

13. On October 26, 2004, the Lake County Stormwater Management Commission granted an exemption allowing the Plaintiff to fill the pond (Complaint Exhibit 2).

14. Campus Investments submitted revised engineering plans to the Village incorporating the engineering changes agreed upon in the Settlement. On April 21, 2005, the Village's Engineer, stated in a letter that the subdivision plans dated April 18, 2005 complied with the engineering comments set out in Ex. B of the Settlement. (Complaint Exhibit 3).

15. On April 22, 2005, the day after the Village Engineer confirmed in writing that all plan changes requested in Exhibit B of the Settlement were satisfied, Brett Bennett, the Village's stormwater engineering consultant, sent a letter to Campus Investments demanding 34 additional engineering changes to the plans.

16. On April 27, 2005 and on March 16 and March 30, 2005, former Village Attorney John Mullen stated at a public meeting that Campus Investments plans were approved by settlement and there was no opportunity for further review.

17. On May 15, 2005 the former Village attorney, John Mullen, retired and the Village hired James Bateman as the Village Attorney who contacted the Plaintiff's attorney, and was informed of Brett Bennett's additional demands.

18. On May 26, 2005, the Village Attorney, James Bateman, investigated the demands by Brett Bennett and stated in an email to Campus Investments attorney that the "Watershed Development Permit Brett [Bennett] issues is essential." The Village Attorney set a meeting at the Village on June 2, 2005 to discuss the changes. Campus Investments objected to additional reviews, but agreed to meet, and asked that Brett Bennett either redline the plans or provide citations showing where the authority for the same is found.

19. On June 2, 2005, the parties met, however, no redlines or citations were given. On June 2, 2005, Campus Investments and its engineer and attorney, met with the Village's consulting engineer Bennett Bennett, the Building Commissioner Robert Streicher, and Village Attorney James Bateman. Brett Bennet wanted the Plaintiff to "take-out a couple of lots" and to make the detention pond larger, or he would not sign-off on the plans, and would not sign-off on the eventual sewer construction during its inspection.

20. On June 3, 2004, the day after the face-to-face meeting, Brett Bennett telephoned Rick Zirk of Grand Pointe Homes, the buyer of the Plaintiff's lots, and informing him that there were problems with the subdivision, and that the problems were not resolved at the meeting the day before. Brett Bennett told Rick Zirk that he would not approve the subdivision unless a couple of lots were removed and the pond enlarged. Brett Bennett also stated that he would be the inspector of development and that he will not approve anything related to the project. He also stated if any plans were given to him for review that he would take his time in reviewing the plans.

21. On June 3, 2004, shortly after receiving the telephone call from Brett Bennett, Rick Zirk telephoned the Village and talked to Building Commissioner Robert Streicher who stated that he was at the meeting the day before and that the subdivision had problems and that this required a larger detention pond and the removal of a couple of lots.

22. On June 6, 2004, Campus Investments informed the Village Attorney of the telephone call from Brett Bennett to Rick Zirk, and asked that he be removed from any further review and inspection of the development.

23. On June 20, 2005 Campus Investments submitted a letter to the Mayor stating that they "would prefer that he remove himself from any further review or inspection of our project." The letter also stated that the mylar would arrive at the village for signature on June 22, 2005, along with the required fees and letter of credit, and that it planned on starting construction on Monday, June 27, 2005.

24. On June 22, 2005 the Village Attorney, James Bateman stated in an email to Campus Investments attorney "I am not able to comment on your desire to start construction next Monday, other than to say that that would obviously be dependent on the securing of all required permits, including those required by other applicable Village ordinances."

25. On July 1, 2005 Campus Investments submit to the Village Attorney a check in the amount of $136,626.61, and a letter of credit in the amount of $875,484.25 as required by Paragraphs 3-7 of the Settlement. He asked mt to instead deliver it to the Village. On July 5, 2005 (the next business day) a check in the amount of $136,626.61, and a letter of credit in the amount of $875,484.25 and the plat was deliver to the Village.

26. Campus Investments has invested over $300,000 in the development of the Property and it has an $800,000 mortgage due on June 30, 2005. Campus Investments also have contract to sell the development and obtained an extension from both the buyer and the mortgage lenders until July 15, 2005. However, if the Village will not comply with its obligations by allowing us to continue the development of the property, the mortgage lender

has informed Campus Investments that they will foreclose on the Property. The buyer (Grand Pointe Homes) has informed Campus Investments that they cannot wait any longer and will also not renew the contract beyond July 15, 2005.

27. Campus Investments has been in litigation for twelve months during the first lawsuit and they have been tirelessly working on the subdivision of the Property for over two years, and unless the Village allows them to start construction, they will have to seek Bankruptcy Court protection to say off the imminent foreclosure, because they do not have the financial resources to pay the mortgage, without the sale of the Property which is conditioned on the ability to start construction.

28. The parties are in agreement on basically everything, but conflict in one material respect. Campus Investments believes that they have complied with all the terms of the Settlement Agreement and should be allowed to start construction and get their plat recorded. The Village believes that Campus Investments has not complied with the Lake County's Watershed Development Ordinance ("County Watershed Ordinance") and must obtain approval from their consultant Brett Bennett before they can proceed to construction. This is a question of law for the court to decide.

**CONCLUSIONS OF LAW**

29. Jurisdiction exists under 28 U.S.C. § 1332(a)(1), as the parties are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. Venue is proper under 28 U.S.C. § 1391(a), since the Village reside and transact its affairs in Lake County, Illinois which is located within the geographical area of this court. See 28 U.S.C. § 93(a)(1) (Northern District of Illinois covers Lake County).

30. In “order to obtain a preliminary injunction, the moving party must show that: (1) they are reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. If the movant can meet this threshold burden, then the inquiry becomes a "sliding scale" analysis where these factors are weighed against one another.” *Joelner v. Village of Wash. Park*, 378 F.3d 613, 619 (7th Cir. 2004).

**<u>Likelihood of Success on the Merits at Trial</u>**

31. “In the preliminary injunction context, a ‘likelihood of success’ exists if the party seeking injunctive relief shows that it has a "better than negligible" chance of succeeding on the merits.” *Meridian Mut. Ins. Co. v. Meridian Ins. Group*, 128 F.3d 1111, 1114 (7th Cir. 1997).

32. When the parties enter into a settlement, and the lawsuit dismissed, the “settlement is just another contract to be enforced in the usual way, that is, by a fresh suit.” *Jessup v. Luther,* 277 F.3d 926, 929-930 (7th Cir. 2002). See also, *Abott Labs. v. CVS Pharm., Inc.*, 290 F.3d 854, 857 (7th Cir. 2002) (“interpretation of a settlement contract is governed by state law”); *Pohl v. United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000) (“Issues regarding the formation, construction, and enforceability of a settlement agreement are governed by local contract law”); *Abbott Lab. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999) (“Local contract law governs the construction and enforcement of settlement agreements.”); *Laserage Tech. Corp. v. Laserage Laboratories, Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) (“A settlement agreement is a contract and as such, the construction

and enforcement of settlement agreements are governed by principles of local law applicable to contracts generally.") Accordingly, Illinois contract law principles must be followed.

33. Besides the above requirement, Illinois law is also required by the choice of law clause in Paragraph 15 of the Settlement Agreement which provides that this "Settlement Agreement is entered into in the State of Illinois and shall be construed and interpreted in accordance with its laws." Accordingly, Illinois contract law principles must be followed.

34. The Seventh Circuit has applied Illinois contract law in interpreting settlement agreements many times in the past. "Interpreting a settlement agreement presents a question of contract law, in which the primary object in construing a contract is to give effect to the intention of the parties." *Lumpkin v. Envirodyne Indus.*, 933 F.2d 449, 455 (7th Cir. 1991)(quotation and citation omitted). In construing the terms of a contract "the starting point must be the contract itself. If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over." *Id.* at 455 (citation omitted). "If the plain language of the contract is ambiguous, then 'the court must go on to declare [the contract's] meaning.'" *Id.* (citation omitted). See *Home Ins. Co. v. Chicago and Northwestern Transp. Co.*, 56 F.3d 763, 768-769 (7th Cir. 1995) (explaining proper analysis for determining when extrinsic evidence is admissible to supplement the interpretation of a written instrument).

35. "In interpreting a contract under Illinois law, the paramount objective is to give effect to the intent of the parties as expressed by the terms of the agreement." *Laserage Tech. Corp., supra*, 972 F.2d at 802 (quotation and citation omitted). In assessing the parties intent, their "[s]ecret hopes and wishes count for nothing" because the "status of a document as a contract depends on what the parties express to each other and to the world, not on what they

keep to themselves." *Id.* (citation omitted). "The contentions of the parties to the contract are not the criteria which should guide the court in determining whether the written contract is a full expression of the agreement of the parties. The court must determine this from the writing itself." *Eichengreen v. Rollins, Inc.*, 757 N.E.2d 952, 958 (Ill. App. 2001). "Where a written agreement is clear and explicit, a court must enforce the agreement as written." *Simmons v. Blauw*, 635 N.E.2d 601, 603 (Ill. App. 1994) (citation omitted).

36. "When interpreting a contract under Illinois law, the intent of the parties to a contract must be determined with reference to the contract as a whole, not merely by reference to particular words or isolated phrases, but by reviewing each part in light of the others." *Air Line Stewards & Stewardesses Assoc., Local 550 v. Trans World Airlines*, 713 F.2d 319, 321-22 (7th Cir. 1983) (citation omitted). The "court must give effect to each and every section of the Agreement, and must read the different sections harmoniously, and accord each section its proper weight, and not read the sections out of context to achieve a desired result. . . ." *Id.* A "written contract should be given a construction that 'harmonizes all the various parts' of the contract so that no provision is 'conflicting with, or repugnant to, or neutralizing of any other.'" *Binks Mfg. Co. v. National Presto Industries, Inc.*, 709 F.2d 1109, 1116 (7th Cir. 1983) (citation omitted).

37. The "language in a contract is not rendered ambiguous simply because the parties do not agree upon its meaning." *Home Ins. Co. v. Chicago & Northwestern Transp. Co.*, 56 F.3d 763 (7th Cir. 1995) (quotation and citation omitted). "Subjective evidence of ambiguity is the testimony of the parties themselves as to what they believe the contract means, which is invariably self-serving, inherently difficult to verify and thus, inadmissible."

*Id.* What the "parties to a written contract may have understood as to the meaning of the language used is not admissible evidence." *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984). Additionally, a "unilateral, or self-induced, mistake" is insufficient to void a clear and unambiguous settlement. *Id.*

38. The parties are in agreement on basically everything, but conflict in one material respect which is essentially a question of contract interpretation. The Village argues that Paragraph 12 of the Settlement Agreement requires Campus Investments to comply with the Lake County's Watershed Development Ordinance ("County Watershed Ordinance") and they must obtain approval from their consultant Brett Bennett before they can proceed to construction. Campus Investments argues that they have complied with all the terms of the Settlement Agreement and that this interpretation is a breach of terms of the Settlement.

39. The court finds that since the language in the Settlement Agreement "unambiguously provides an answer to the question at hand, the inquiry is over." *Lumpkin*, 933 F.2d at 455 (citation omitted); see *Air Line Stewards*, 763 F.2d at 877-78 ("if the language of the Settlement Agreement clearly and unambiguously determines an answer to the question at issue, then the inquiry is over.")

40. The starting point is the Settlement Agreement itself. However, Paragraph 12, the provision at issue, must be interpreted with reference to the Settlement as a whole, and not in isolation. The Settlement states in the recital that the parties agree to resolve "their disputes regarding the subdivision and development of the Property" and attach the July 6 2004 development plans to the Settlement as Exhibit A and defined them as the "Final Plat."

41. Paragraph 1 states that the "Village agrees that the Property may be subdivided into a 30-lot subdivision in accordance with the Final Plat" however Campus Investments "agree to correct the Final Plat to conform to the comments from the Village Engineer attached hereto as Exhibit B" and once "these changes are made, the Plat Officer, the Mayor and Village Clerk shall sign the Final Plat for recording." Simply put, once the July 6 2004 development plans are corrected to comply with Exhibit B, the plans can be recorded.

42. Paragraph 2 provides that "the subdivision of the Property shall require, unless exempt, the approval from the Lake County Stormwater Management Commission (hereinafter "SMC")" to fill the "pond located on the Property." Paragraphs 3, 4, 5 and 7 that "[p]rior to execution of the Final Plat" Campus will pay various fees and post a letter of credit before starting construction. Paragraphs 7 provides that Campus Investments "**shall not begin construction of the public improvements, until the plat is recorded** and until submitting said irrevocable letter of credit." (bold added).

43. Paragraph 12 provides that "**except as provided herein, the development of the Property shall occur in accordance** to and comply with all ordinances, codes and regulations of the Village, including but not limited to the Village Zoning Ordinance and Subdivision Control Ordinance and the Village Building Code." (bold added).

44. Paragraph 14 provides that the "Settlement Agreement and any documents that may be executed hereunder, contain the entire agreement between" the parties. Paragraph 15 provides that in "the event of any conflict between this Settlement Agreement and any codes, ordinances, rules or regulations of the Village, the provisions of this Settlement Agreement shall prevail and govern to the extent of any such conflict or inconsistency." Paragraph 16 the parties waives any right to "contest the validity or enforceability of this Settlement Agreement or any provision hereof."

45. Paragraph 17 permits enforcement by an action "for specific performance, declaratory judgment, injunctive relief" however the parties cannot "be liable for monetary damages." Paragraph 20 makes the Settlement"binding upon" the parties "agents, attorneys" and "contractors." In Paragraph 21 the parties agree to cooperate fully and execute "take all additional actions which are consistent with and which may be necessary or appropriate to give full force and effect to the basic terms and intent of this Settlement Agreement." Paragraphs 5, 8, 9, 10, 11, 13, 18, 19 add nothing, and are not relevant to the present dispute.

46. On October 26, 2004, the Lake County Stormwater Management Commission granted an exemption allowing the Plaintiff to fill the pond. (see Complaint Exhibit 2). On April 21, 2005, the Village's Engineer, stated in a letter that the April 18, 2005 plans complied with the 21 engineering changes set out in Exhibit B of the Settlement. (Complaint Exhibit 3). On July 5, 2005 Campus Investments submit a check for $136,626.61, and a letter of credit for $875,484.25 and also delivered the plat to the Village for signature.

47. The Village Attorney, informed Campus Investments on June 22, 2005 that they could not start construction because they did not secure all required permits. However, Campus Investments complied with all of their obligations required by the Settlement prior to commencement of construction. The agreed changes to plans were approved by the Village on April 21, 2005. The County exempted the filling of the pond and all fees and the letter of credit were posted. Paragraph 20 mandates that the Settlement is binding upon any Villages "agents, attorneys, contractors, legal representatives." Hence, the Settlement applies to the Village Attorney. In fact the former Village Attorney stated on March 16, March 30, 2005, and April 27, 2005, at public meetings that Campus Investments plans were approved by Settlement and there was no opportunity for further review.

48. Pursuant to Paragraphs 1 once the changes in Exhibit B were made "the Plat Officer, the Mayor and Village Clerk shall sign the Final Plat for recording." Therefore, Campus Investments can begin construction. See Paragraphs 7 ("Plaintiff shall not begin construction of the public improvements, until the plat is recorded and until submitting said irrevocable letter of credit.") Campus Investments complied with Paragraphs 1-7 of the Settlement. However, under the Village's interpretation, Campus Investments must make plan changes, post a letter of credit, and pay review fees, but they cannot start construction. This interpretation does not give effect to each and every paragraph of the Settlement.

49. Paragraph 12 provides that "except as provided herein, **the development of the Property** shall occur in accordance to and comply with all ordinances, codes and regulations of the Village." Paragraph 12 applies to the "**development** of the property" and not the **subdivision** of the Property. The Property is first subdivided by getting subdivision plans approved, and then it is developed by installing the improvements. Paragraph 12 notes the difference between subdividing and developing land by noting that Village regulations include the "zoning ordinance, **subdivision** regulations, **development** standards."

50. Paragraph 12 applies to the **development** of the Property. On the other hand Paragraph 1 deals with the **subdivision** of the Property. See Paragraph 1 ("the Property may be **subdivided** into a 30-lot subdivision. . . do not materially change the **subdivision**.") The recitals display the difference between the "development" and the "subdivision" of the Property by comparing the fifth recital ("the Plaintiffs desire to **subdivide** the Property into a 30 lot subdivision as shown on the Final Plat") with the sixth recital (the parties are "desirous of resolving their disputes regarding the **subdivision** and **development** of the

Property.") The Village's interpretation is also not supported by Paragraph 3 requiring the payment of fees "to review the **subdivision** of the Property." On the other hand, Paragraph 4 covers the "inspection fees" during the development.

51. Additionally, Paragraph 12 requires compliance with "ordinances, codes and regulations of the Village" there is no statement about compliance with any county regulations, or any "County Watershed Ordinance." In fact, Paragraph 2 requires approval or exemption from the County to fill the pond on the Property. The logical location for additional compliance with County regulations is in Paragraph 2, however, it only requires approval to fill the pond. It is silent on any obligation to obtain county stormwater approval.

52. Also noteworthy is that Paragraph 12 begins with "**except as provided herein**" and the Village's interpretation of Paragraph 12 conflicts with Paragraph 1 which requires the Plaintiff "to **correct** the Final Plat to conform to the comments from the Village Engineer attached hereto as Exhibit B." If the Village's interpretation were accurate, then Paragraph 1 would provide for approval upon compliance with all "ordinances, codes and regulations of the Village." It does not so provide. Moreover, the Settlement attached the detailed plans as Exhibit A and defined them as the "Final Plat" (not the preliminary plans) and provided that the Village agreed that the Property could be subdivided "in accordance with the Final Plat." The Village's interpretation is in direct conflict with this promise.

53. The Village's interpretation of Paragraph 12 is not in harmony with Paragraph 15 which provides that in "the event of any conflict between this Settlement Agreement and any codes, ordinances, rules or regulations of the Village, the **provisions of this Settlement Agreement shall prevail** and govern to the extent of any such conflict or inconsistency."

Paragraph 15 confirms that the Settlement operates outside the Village's ordinances, codes and regulations and gives greater authority to the Settlement terms than those found in the Village ordinances, codes and regulations by exempting any conflict with the same. If the Village's interpretation of Paragraph 12 is followed (must comply "with all ordinances, codes and regulations of the Village") then Paragraph 15 conflicts with that interpretation, by permitting and recognizing conflicts with the Village ordinances, codes and regulations.

54. Additionally, if Campus Investments must comply with all "ordinances, codes and regulations of the Village" it appears that this is being selectively enforced, because the Plaintiff has bypassed the public approval process for appearing before the Planning Commission or the Village Board, all of which is required by the Village's ordinances. The Village's argument bypasses some regulations, in contradiction to their very interpretation.

55. The central issue in the prior litigation is Campus Investments contention that the subdivision of the Property was deemed approved. The Settlement Agreement was signed two weeks before Campus Investments motion for summary judgment seeking deemed approval of the plat was set for hearing. Under the Village's interpretation, Campus Investments did not agree to the deemed approval of the subdivision. The court finds the Village's interpretation incredible considering that this was the central issue in the litigation.

56. The Villages interpretation would require endless plan reviews in contradiction to the central dispute in the prior litigation. This interpretation of the Settlement conflicts with the detailed engineering changes to the plans in Exhibit B. It is ridiculous to believe that detailed engineering changes are set in the Settlement, however, what the Village really meant is that the changes were to come from a yet undone engineering review. After all, the

plans were submitted to the Village on July 6, 2004. Also, the Village must have reviewed them before the Settlement in order to assemble the detailed changes in Exhibit B. It is difficult to believe that the Village did a partial review, and included only some of their engineering changes, but excluded others, especially since this was the central issue in the prior litigation. If the Village's interpretation were accurate, which it isn't, then there is no requirement for any list attached in Exhibit B as the Plaintiff had to go through the review process and comply with all development regulations.

57. The Settlement provides that the "Plaintiffs desire to subdivide the Property into a 30 lot subdivision as shown on the Final Plat" and the parties "resolv[ed] their disputes regarding the subdivision" of the Property with the "Village agree[ing] that the Property may be subdivided into a 30-lot subdivision in accordance with the Final Plat" if they "correct the Final Plat to conform to the comments from the Village Engineer attached hereto as Exhibit B." Moreover, the Plaintiffs shall "begin construction of the public improvements" once "the plat is recorded" and the "letter of credit" submitted. Paragraph 12 simply requires Campus Investments to comply with all Village regulations with regards to the "development of the Property." This interpretation gives all the various paragraphs meaning and leaves no provision is conflicting with, or repugnant to, or neutralizing of any other.

58. The Villages interpretation of Paragraph 12 mandates compliance with the County Watershed Ordinance, however, this conflicts with 55 ILCS 5/5-1062 which provides that "the county **shall not enforce rules and regulations**" in any municipality where stormwater regulations are "being enforced by the municipal authorities." 55 ILCS 5/5-1062(k). On June 28, 2000 the Village adopted its Site Dev. Ordinance (Ord. 2000-6-3) and

it defines the enforcement officer as the "**mayor** or such other person as is so designated from time to time by the Village Board." Site Dev. Ordinance § 14.1 (pg 70). There is no provision in the Site Dev. Ordinance for enforcement by the County.

59. It is also noteworthy, that even if the County Watershed Ordinance applies that by its very terms it designates authority in incorporate areas to the Village "and upon certification, the community's designated Enforcement Officer shall enforce all provisions of [the WDO] **within the community's jurisdiction**." See WDO Art. III (pg 2). The Village's stormwater consultant is applying the Site Dev. Ordinance and not the County Watershed Ordinance. Consequently, as a consultant of the Village, Brett Bennett is also bound to the terms of the Settlement by Paragraph 20 which makes the Settlement binding upon the Villages "agents" and "contractors." He is an independent contractor.

60. The Village's interpretation is rejected because it fails to be given a construction that harmonizes all the various paragraphs. The Village interprets the Paragraph 12 in isolation. If the Paragraph 12 is reviewing in light of Paragraph 15 (or Paragraph 1, 2) it is apparent that under well-settled rules of contract interpretation that the Village is wrong. Said differently, the Village reads Paragraph 12 out of context to achieve a desired result. However, "this court must give effect to each and every section of the Agreement, and must read the different sections harmoniously, and accord each section its proper weight, and not read the sections out of context to achieve a desired result as the plaintiffs request." *Air Line Stewards*, 713 F.2d at 322.

61. Campus Investments has established by a preponderance of the credible evidence that the terms of the Settlement Agreement are clear and definite, and that there was a meeting of the minds between them and the Village whey the settle the underlying dispute. They have also established by a preponderance of the credible evidence that the Village has prevented them from starting construction, and that the Village is therefore in breach of the terms fo the Settlement Agreement.

62. Campus Investments has also established by a preponderance of the credible evidence that they have complies with all terms of the Settlement Agreement and have satisfied all conditions required on its part to commence the development of their 30-lot subdivision in accordance with the latest plans approved by the Village.

63. Additionally, pursuant to Paragraph 21 the Village agrees to "cooperate fully" and "take all additional actions which are consistent with and which may be necessary or appropriate to give full force and effect to the basic terms and intent of this Settlement Agreement." The Village has breached Paragraph 21 by failing to take all actions to allow the construction to commence. The Village has also breached its implied obligation of good faith and fair dealing, *Greer Properties, Inc. v. LaSalle Nat. Bank*, 874 F.2d 457, 460 (7th Cir. 1989), by arbitrarily imposing additional engineering changes on Campus Investments after they satisfactorily performed all its obligations under the Settlement Agreement.

64. Campus Investments has shown a "better than negligible" chance of succeeding on the merits. Campus Investments has in fact shown that it has complied with it's promise and the Village has not, and there is an overwhelming likelihood that they will prevail on the merits of this lawsuit at trial.

## No Adequate Remedy at Law Exists

65. Paragraph 17 of the Settlement provides that "in no event shall the parties or any of their officers, agents or employees be liable for monetary damages in connection therewith." Consequently, Campus Investments does not have an adequate remedy at law for the injuries which they have suffered and will continue to suffer in the future unless the Village's wrongful conduct is restrained and enjoined.

## Irreparable Injury If the Injunction Is Not Issued

66. "A preliminary injunction is often said to be designed to maintain the status quo pending completion of the litigation. This is not the happiest formula--in fact it's both inaccurate (as preliminary injunctions are often issued to enjoin the enforcement of a statute or contract and thus interfere with existing practices) and empty."*Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 464 (7th Cir. 2001) (citations omitted). The Seventh Circuit noted in *Praefke Auto*: "Had there been a contract between the two firms that [the defendant] terminated, the preliminary injunction would have been short and sweet; it would have said, **resume performance in accordance with the contract**." *Id.* at 464.

67. The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. See *American Hosp. Supply Corp. v. Hospital Prod. Ltd.*, 780 F.2d 589, 594 (7th Cir. 1985) ("premise of the preliminary injunction is that the remedy available at the end of trial will not make the plaintiff whole.")

68. Since damages are excluded Campus Investments cannot be made whole if the trial is delayed. Moreover, the existing status quo is causing the Plaintiff irreparable injury,

and it is necessary to alter the situation so as to prevent the injury by returning the parties to their last uncontested status, i.e., the Village was honoring -- not breaching -- the terms of the settlement agreement. See *International Union, etc. v. J. I. Case Co.*, 281 F.2d 773, 775 (7th Cir., 1960) ("We have defined the status quo as the last uncontested status which preceded the pending controversy.") The last uncontested status was where the Village was honoring the Settlement Agreement, and that is what Campus Investments wants to return them to, no more and no less.

69. Generally to establish irreparable harm, the injury must be one requiring a remedy other than money damages, however, since money damages are not available, also in *Doran v. Salem Inn, Inc*, 422 U.S. 922, 932 (1975) the Supreme Court held that the issuance of a preliminary injunction was not an abuse of discretion because "absent preliminary relief [the plaintiffs'] would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."

70. Campus Investments has invested over $300,000 in the development of the Property and it has an $800,000 mortgage due on June 30, 2005. Campus Investments also has contract to sell the development and obtained an extension from both the buyer and the mortgage lenders until July 15, 2005. However, if the Village will not comply with its obligations by allowing us to continue the development of the property, the mortgage lender has informed Campus Investments that they will foreclose on the Property. Also, the buyer (Grand Pointe Homes) has also informed Campus Investments that they cannot wait any longer and will also not renew the contract beyond July 15, 2005.

71. Campus Investments has been in litigation for twelve months during the first lawsuit and they have been tirelessly working on the subdivision of the Property for over two years, and unless the Village allows them to start construction, they will have to seek Bankruptcy Court protection to say off the imminent foreclosure. The threat of bankruptcy adumbrates the irreparable harm in this case, making this the exceptional case where the continued denial of the right to commence construction will force Campus Investments into bankruptcy to stave off foreclosure. Simply put, Campus Investments will suffer imminent, irreparable harm absent the granting of an order from this Court.

72. Campus Investments harm cannot be rectified by monetary damages. There is a direct connection between the bankruptcy filing and the Village's failure to honor the terms of the Settlement Agreement. Ordering the Village to abide by it's promise after July 15, 2005 will not provide effective relief. As noted, it is the failure of the Village to honor it's promise which makes the likelihood of bankruptcy more than merely speculative. Irreparable harm has been adequately demonstrated. To require the Plaintiff to delay until bankruptcy is imminent would render any future relief a an empty victory. As the Seventh Circuit noted in *Anderson v. USF Logistics*, 274 F.3d 470, 478 (7th Cir., 2001) to "demonstrate irreparable injury, [the plaintiff] must show that she will suffer harm that cannot be prevented or fully rectified by the final judgment after trial." This is exactly the case here. Campus Investments cannot wait until the end of trial to get its relief. Campus Investments has made an extremely strong showing that it has no adequate remedies at law and will suffer irreparable harm in the absence of a preliminary injunction.

## Injunction Will Not Harm the Public Interest

73. An injunction will not be adverse to the public interest as the public has a vital interest in the vigorous enforcement of settlement agreements. The Village agreed to the approval of the development, and Campus Investments seeks compliance with its promise. The Settlement Agreement precluded future damages, and if an injunction is not granted then future litigation will be unlikely to similarly agree.

74. The Village approved the subdivision on October 13, 2005 and agreed that the plans only need twenty-one engineering changes before construction could start. Campus Investments has made the changes, and if the Village can disregard their commitments, the all settlements in the future can be harmed and this harms the public interest. This harms the public interest in seeing litigation resolved between the parties and not the courts.

75. The public interest is also not harmed by the development of the Property. Campus Investments engineer has certified that the plans comply with stormwater engineering standards. Their contractors are similarly satisfied with the stormwater construction. Also, the plans have been scrutinized for over two years by Village engineers, and Campus Investments has made the changes demanded. The public is not harmed by granting the injunction, to the contrary, the prevention of an arbitrary breach by the Village and the prevention of subjective reviews does not harm the public.

76. Additionally the public interest is better served by a preliminary injunction that ensures compliance with the Village's promises. The public will not benefit by a breach from the Village which would result in damages. The public has an interest in seeing that Village carry out their promises, and will not be harmed by granting the injunction. On the contrary,

forcing the Village to honor its promises is in the public interest. Also, the economic benefits of the project, and the need for adequate interpretation of the Settlement favors preliminary injunctive relief.

**Balance of Hardships**

77. In balancing the hardships in the present case, there can be no question but that the scales tip overwhelmingly toward Campus Investments. The Village can show no hardship whatsoever from the granting of an injunction, while the harm that would come to Campus Investments from the denial of injunctive relief would be both substantial and irreparable. Based upon all of the foregoing, the balance of hardships favors Campus Investments.

78. See *Hakim v. Payco-General Am. Credits*, 272 F.3d 932, 935 (7th Cir. 2001) (If a court has "reasonable confidence that it knows what the contract means, it ought not put the litigants (and the trier of fact) to the bother, expense, and uncertainty of a trial or other evidentiary hearing.")

**Judgement**

79. Accordingly, judgment is entered for plaintiff Campus Investments, and against the Village as follows: A preliminary injunction is issued enjoining and restraining the Village its employees, agents, attorneys, servants and its successors and assigns and anyone acting on its behalf, from refusing to permit Campus Investments or its successors and assigns from constructing the Lake Vista subdivision in accordance with the most recent plans approved by the Village, and further restraining and enjoining the Village of Lake Villa, and anyone acting on its behalf, from engaging in retaliatory inspection of the development and construction of the subdivision in accordance with its approved plans.

Dated: July 11, 2005

Respectfully submitted,

Sebastian Rucci (ND IL No. 90785689)
3058 Chardonnay Lane
Poland, Ohio 44514
Phone: (330) 707-1182
Fax: (330) 707-1882
Email: SRucci@msn.com
Attorney for the Plaintiff

**CERTIFICATE OF SERVICE**

Counsel for the Plaintiff's certifies that on July 11, 2005 he deposited a copy of the above document in a United States Postal Service mailbox in Poland, Ohio, in a sealed envelope with postage fully prepaid, addressed to Hervas, Sotos, Condon & Bersani, Attn: Charles Hervas, 333 Pierce Road, Suite 195, Itasca, IL 60143 and to Law Offices of James P. Bateman, Ltd., Attorney for Lake Villa, 600 Hart Road, Suite 260, Barrington, IL 60010. The same was also emailed to the above attorneys.

Sebastian Rucci